# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### BEAUMONT DIVISION

| | | |
|---|---|---|
| SRINIVASA RAO KAMBALA, SRINIVASA RAO GONNA, AMANDEEP SINGH KANG, SARAVANAN ARUNACHALAM, CHANDRA SEKHAR DWADASI RAMA, ANTONY ANTONY VALIYAPARAMBIL, HARBANS SINGH, ANNADURAI RUTHIRAPATHI, PONNIAH MUTHU KUMAR, MAHENDRAN PERIYASAMY, MALKIAH PAUL, HARVINDER SINGH, PRADEEP KUMAR, ABDULLA KEEPURATH MAIDEEN, FRANCIS SEQUIRA, UNNIKRISHNAPILLAI BALAKRISHNA PILLAI, SRINIVASA REDDY DALLI, BIJU KUNJUPANICKAN, RAMANA PALIKA, NESAMONY WILSON ROBI, and RAGUKUMAR CHINNIAN | § § § § § § § § § § § § § § § § § § § § § | Civ. No. 1:13-cv-498-RC-ZJH |
| Plaintiffs, | § § | |
| v. | § § § | **Amended Complaint and Jury Demand** |
| SIGNAL INTERNATIONAL LLC, SIGNAL INTERNATIONAL, INC., SIGNAL INTERNATIONAL TEXAS, G.P., SIGNAL INTERNATIONAL TEXAS, L.P., MALVERN C. BURNETT, LAW OFFICES OF MALVERN C. BURNETT, A.P.C., GULF COAST IMMIGRATION LAW CENTER, L.L.C., GLOBAL RESOURCES INC., DEWAN CONSULTANTS PVT. LTD. (a/k/a MEDTECH CONSULTANTS), SACHIN DEWAN, INDO-AMERI SOFT L.L.C., KURELLA RAO, J & M ASSOCIATES OF MISSISSIPPI, INC., BILLY R. WILKS, and J & M MARINE & INDUSTRIAL, LLC, | § § § § § § § § § § § § § § § § | |
| Defendants. | § | |

_____

## PLAINTIFFS' THIRD AMENDED COMPLAINT

*Third Amended Complaint*                                                                    1

1. Using our nation's guestworker program as a conduit, the Defendants trafficked approximately 590 Indian men, including the Plaintiffs (as defined below) into the United States with the aim of securing inexpensive and exploitable skilled workers to perform welding, pipefitting, and other marine fabrication work at plants in Orange, Texas and Pascagoula, Mississippi. Having crossed that line, the Defendants then more deliberately deceived, defrauded, and intimidated the workers in an attempt to continue to benefit from their illegal scheme. As a result, Plaintiffs, towards whom the Defendants held a strong and pervasive racial animus, suffered and continue to suffer some combination of financial ruin, desperate poverty, extreme emotional distress, loss of reputation, physical sickness and disease, loss of religious and ethnic identity, suffering based on race and national origin, and forced separation from family and home.

## **INTRODUCTION**

2. Plaintiffs, Srinivasa Rao Kambala, Srinivasa Rao Gonna, Amandeep Singh Kang, Saravanan Arunachalam, Chandra Sekhar Dwadasi Rama, Antony Antony Valiyaparambil, Harbans Singh, Annadurai Ruthiripathi, Ponniah Muthu Kumar, Mahendran Periyasamy, Malkiah Paul, Harvinder Singh, Pradeep Kumar, Abdulla Keepurath Maideen, Francis Sequira, Unnikrishna Pillai Balakrishna Pillai, Srinivasa Reddy Dalli, Biju Kunjupanickan, Ramana Palika, Nesamony Wilson Robi, and Ragukumar Chinnian bring this action to recover for the unlawful and fraudulent behavior by Defendants Signal International LLC, Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P.   (collectively referred to as "Signal") and Signal's agents, including Defendants Malvern C. Burnett, the Law Offices of Malvern C. Burnett, Gulf Coast Immigration Law Center, LLC (collectively referred to as the "Legal Facilitator Defendants"), as well as Defendants Global Resources, Inc., Dewan Consultants Pvt. Ltd., Sachin Dewan (collectively referred to as "the Recruiter Defendants"), as well as

Defendants Indo-Ameri Soft, L.L.C., Kurella Rao, J & M Associates of Mississippi, Inc., Billy R. Wilks, and J & M Marine & Industrial LLC (collectively referred to as the "Labor Broker Defendants").

3. Signal is a Gulf Coast-based marine and fabrication company.  In the aftermath of Hurricane Katrina, Signal set out to recruit several hundred foreign workers to work as welders and pipefitters in Signal's Pascagoula, Mississippi and Orange, Texas facilities.

4. To assist in that process, Signal retained the Recruiter Defendants, Michael Pol and his company Global Resources, Inc. ("Global"), a labor recruitment firm with operations in Mississippi; Malvern C. Burnett, an attorney based in Mississippi and Louisiana; and Sachin Dewan, a labor recruiter in India, to recruit workers on Signal's behalf.  Signal also executed a power of attorney authorizing Dewan's company, Dewan Consultants Pvt. Ltd., to recruit for Signal abroad.

5. In addition, workers were recruited for Signal by the Labor Broker Defendants, Kurella Rao and his company Indo-Ameri Soft, L.L.C.; and Billy R. Wilks and his company J & M Associates of Mississippi, Inc., which was later succeeded by J & M Marine & Industrial LLC.

6. The cornerstone of the Defendants' scheme was the tantalizing prospect that Signal would be able to hire a skilled workforce at effectively no cost by forcing the Plaintiffs and their coworkers to foot the bill for their own recruitment, immigration processing, and travel.  Indeed, an April 18, 2006 "Skilled Worker Recruitment Agreement" between Signal and Global expressly stated that the workers would be delivered at no cost to Signal and that all other charges, expenses, and fees would be paid by the workers themselves or by Global, who in turn would be reimbursed through deductions from the Plaintiffs' wages.  In short, Defendants paid nothing; the future employees paid everything.

7. Defendants told Plaintiffs that because the permanent residency process could take up to two years to complete and Signal's need for workers was immediate, Defendants would first assist Plaintiffs in obtaining temporary work visas, known as H-2B visas, while simultaneously applying for green cards.

8. Lured by, and in reliance upon, Defendants' fraudulent promises of legal and permanent work-based immigration to the United States for themselves and their families, Plaintiffs plunged themselves and their families into debt to take advantage of these seemingly promising opportunities. Plaintiffs incurred significant debts to pay mandatory recruitment, immigration processing, and travel fees charged by Defendants totaling as much as $10,000 to $24,000 per worker, equivalent to two to three years of an Indian welder's salary working in India. Trusting the veracity of the immigration and work benefits promised by Defendants, Plaintiffs further relinquished stable employment opportunities in India and as guest workers in Africa, Canada, the Persian Gulf and Singapore.

9.  Defendants' main recruiting agents in India and the United Arab Emirates held Plaintiffs' passports and visas, and threatened, coerced, and defrauded Plaintiffs into paying extraordinary fees for recruitment, immigration processing, and travel. Several Defendants further caused Plaintiffs to believe that if they did not work for Signal under the auspices of temporary, Signal-restricted, H-2B guest worker visas, they would suffer abuse or threatened abuse of the legal process, physical restraint, or other serious harm.

10. The false promises, collection of exorbitant recruiting fees, and strong-arm tactics of Signal and its agents were, upon information and belief, authorized by Defendant Signal. Defendant Signal knew of the exorbitant fees charged and the Plaintiffs' green card expectations before the Plaintiffs arrived at Signal's facility. (See Order and Reasons Denying Class Certification, at 33,

*Kurian David, et al. v. Signal International, LLC, et al.,* 2:08-cv-01220-SM-DEK, (E.D. La. Jan. 4, 2012), ECF No. 1117.) Far from taking any corrective measures, Defendant Signal ratified and perpetuated the scheme by continuing to facilitate the transportation of additional waves of Indian H-2B workers, including Plaintiffs, through April 2007.

11. Upon Plaintiffs' arrival in the United States, Defendant Signal fulfilled its promise to employ only some of the workers which it had recruited. For those Plaintiffs which were employed by Signal, Signal required that Plaintiffs live in one of two guarded, overcrowded, and isolated labor camps located in Orange, Texas (the "Texas Labor Camp") and Pascagoula, Mississippi (the "Mississippi Labor Camp"). Defendants further deceived Plaintiffs regarding their visa status, threatened Plaintiffs with arrest, loss of immigration status and deportation, and generally perpetrated a campaign of psychological abuse, coercion, and fraud designed to render Plaintiffs afraid, intimidated, and unable to leave Signal's employ.

12. Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at the Texas Labor Camp and the Mississippi Labor Camp to which non-Indian and United States citizen employees were not subjected. Moreover, Defendant Signal imposed upon Plaintiffs discriminatory job-related requirements and adverse terms and conditions of employment on Plaintiffs to which non-Indian and United States citizen employees were not subjected. Defendant Signal subjected Plaintiffs to an objectively hostile and abusive work environment on account of Plaintiffs' race and alienage.

13. Furthermore, Defendant Signal recruited some Plaintiffs and did not fulfill its promise to employ them. Signal continued to recruit these Plaintiffs knowing that it did not intend to employ these Plaintiffs. Signal knew the Plaintiffs had incurred substantial debt, given up stable jobs, and travelled half-way across the world. Signal knew or should have known that the Plaintiffs arrived

at airports in the United States expecting to be picked up by Signal representatives and Signal did not pick them up or notify them that no one was coming to pick them up.  Signal's refusal to employ Plaintiffs was in direct contrast to promises Signal made to the United States government in its petition for H-2B visas, and to promises Signal made to the Plaintiffs themselves during the recruitment process, and, furthermore, was done because Plaintiffs were Indian nationals.

14. Plaintiffs assert claims against Defendants arising from violations of their rights under the Victims of Trafficking and Violence Protection Act ("TVPA") (18 U.S.C. § 1581, et al.); the Racketeer Influenced and Corrupt Organizations Act ("RICO"); the Civil Rights Act of 1866 (42 U.S.C. § 1981); the Ku Klux Klan Act of 1871 (42 U.S.C. § 1985); the Declaratory Judgment Act (28 U.S.C. §2201); and claims for damages arising from fraud, negligent misrepresentation, and breach of contract.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), 18 U.S.C. § 1595(a) (civil trafficking), 18 U.S.C. § 1964(c) (RICO), and 28 U.S.C. § 1343 (civil rights).

16. This Court has supplemental jurisdiction over the causes of action based on state law pursuant to 28 U.S.C. § 1367(a), as the state law claims arise out of the same nucleus of operative facts which support the federal claim.

17. This Court has personal jurisdiction over Signal entities pursuant to Fed. R. Civ. P. 4(k) and Texas Code §17.042, because they are registered to do business in Texas, maintain a continuing business presence in the state, operated the Orange, Texas facility and labor camp where the Plaintiffs worked and resided, and where Signal engaged in wrongful conduct, and a

substantial portion of the communications, transactions, events, or omissions underlying Plaintiffs' claims occurred either in Texas or to secure labor for Signal's facility in Orange, Texas.

18. This Court has personal jurisdiction over the other Defendants under Fed. R. Civ. P. 4(h) and Texas Code §17.042, because they recruited Plaintiffs for employment at Signal's facility in Orange, Texas, had substantial business contacts with Texas, and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims either occurred in Texas or occurred to secure labor for Signal's facility in Orange, Texas. Further, this Court has personal jurisdiction over the other Defendants under Fed. R. Civ. P. 4(k), because it is authorized by 18 U.S.C. §1965(b).

19. Venue is proper in the Eastern District of Texas under 18 U.S.C. § 1965 and 28 U.S.C. § 1391 in that various Defendants and/or agents of Defendants, resided or have been found in Orange, Texas during the relevant time periods and a substantial portion of the communications, transactions, events or omissions underlying Plaintiffs' claims occurred in this judicial district.

20. Declaratory relief is sought under 28 U.S.C. §§ 2201 *et seq.*

## **PARTIES**

### Plaintiffs

21. Plaintiffs are former H-2B guestworkers who were recruited from India and the Middle East by Defendants at various times between 2003 and 2007.

22. As Indian nationals of South Asian Indian descent, Plaintiffs are members of a racial minority, as contemplated by 42 U.S.C. § 1981.

23. At all relevant times, Plaintiffs were "persons" within the meaning of that term as defined by RICO, 18 U.S.C. § 1961(3).

24. At all relevant times, Plaintiffs were recruited and/or employed by Defendant Signal.

25.  At all relevant times, Defendants were engaged in interstate commerce or in the production of goods for sale in interstate commerce.

26.  Plaintiff Srinivasa Rao Kambala ("Plaintiff Kambala") is a resident of India and a pipefitter by trade.  Plaintiff Kambala was induced by Defendants to leave Mumbai, India on an airplane on or about December 17, 2006 to work for Defendant Signal in Orange, Texas.

27.  Plaintiff Srinivasa Rao Gonna ("Plaintiff Gonna") is a resident of India and a welder by trade.  Plaintiff Gonna was induced by Defendants to leave Mumbai, India on an airplane on or about November 17, 2006 to work for Defendant Signal in Pascagoula, Mississippi.

28.  Plaintiff Amandeep Singh Kang ("Plaintiff Kang") is a resident of Texas and a pipefitter and welder by trade.  Plaintiff Kang was induced by Defendants to leave Mumbai, India on an airplane on or about February 2, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Kang.

29.  Plaintiff Saravanan Arunachalam ("Plaintiff Arunachalam") is a resident of Mississippi and a pipefitter by trade.  Plaintiff Arunachalam was induced by Defendants to leave Mumbai, India on or about March 29, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Arunachalam.

30.  Plaintiff Chandra Sekhar Dwadasi Rama ("Plaintiff Rama") is a resident of India and a pipefitter by trade.  Plaintiff Rama was induced by Defendants to leave Mumbai, India on an airplane on or about December 17, 2006 to work for Defendant Signal in Orange, Texas.

31.  Plaintiff Antony Antony Valiyaparambil ("Plaintiff Valiyaparambil") is a resident of India and pipefitter by trade.  Plaintiff Valiyaparambil was induced by Defendants to leave Mumbai, India on an airplane on or about February 1, 2007 to work for Defendant Signal in Orange, Texas.

32. Plaintiff Harbans Singh ("Plaintiff Hb. Singh") is a resident of Texas and welder by trade. Plaintiff Hb. Singh was induced by Defendants to leave Mumbai, India on or about January 24, 2007 to work for Defendant Signal in Orange, Texas.

33. Plaintiff Annadurai Ruthirapathi ("Plaintiff Ruthirapathi") is a resident of Texas and pipefitter and mechanic by trade.  Plaintiff Ruthirapathi was induced by Defendants to leave Mumbai, India on an airplane on or about March 28, 2007 to work for Defendant Signal in Orange, Texas.  Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Ruthirapathi.

34. Plaintiff Ponniah Muthu Kumar ("Plaintiff Po. Kumar") is a resident of Texas and pipefitter and welder by trade.  Plaintiff Po. Kumar was induced by Defendants to leave Mumbai, India on an airplane on or about January 24, 2007 to work for Defendant Signal in Orange, Texas.

35. Plaintiff Mahendran Periyasamy ("Plaintiff Periyasamy") is a resident of Mississippi and pipefitter by trade.  Plaintiff Periyasamy was induced by Defendants to leave Mumbai, India on an airplane on or about January 25, 2007 to work for Defendant Signal in Orange, Texas.

36. Plaintiff Malkiah Paul ("Plaintiff Paul") is a resident of India and pipefitter by trade. Plaintiff Paul was induced by Defendants to leave Mumbai, India on an airplane on or about February 14, 2007 to work for Defendant Signal in Orange, Texas.

37. Plaintiff Harvinder Singh ("Plaintiff Hv. Singh") is a resident of Texas and welder by trade. Plaintiff Hv. Singh was induced by Defendants to leave Mumbai, India on an airplane on or about March 21, 2007 to work for Defendant Signal in Orange, Texas.

38. Plaintiff Pradeep Kumar ("Plaintiff Pr. Kumar") is a resident of South Carolina and pipefitter by trade.  Plaintiff Pr. Kumar was induced by Defendants to leave Mumbai, India on an airplane on or about December 13, 2006 to work for Defendant Signal in Orange, Texas.

39. Plaintiff Abdulla Keepurath Maideen ("Plaintiff Maideen") is a resident of Texas and welder and pipefitter by trade.  Plaintiff Maideen was induced by Defendants to leave Mumbai, India on an airplane on or about March 31, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Maideen.

40. Plaintiff Francis Sequira ("Plaintiff Sequira") is a resident of Louisiana and pipefitter by trade.  Plaintiff Sequira was induced by Defendants to leave Mumbai, India on an airplane on or about April 2, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Sequira.

41. Plaintiff Unnikrishna Pillai Balakrishna Pillai ("Plaintiff Pillai") is a resident of Louisiana and pipefitter by trade.  Plaintiff Pillai was induced by Defendants to leave Mumbai, India on an airplane on or about April 26, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Pillai.

42. Plaintiff Srinivasa Reddy Dalli ("Plaintiff Dalli") is a resident of Texas and pipefitter by trade. Plaintiff Dalli was induced by Defendants to leave Mumbai, India on an airplane on or about February 1, 2007 to work for Defendant Signal in Orange, Texas.

43. Plaintiff Biju Kunjupanickan ("Plaintiff Kunjupanickan") is a resident of Louisiana and welder by trade. Plaintiff Kunjupanickan was induced by Defendants to leave Mumbai, India on an airplane on or about April 3, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Kunjupanickan.

44. Plaintiff Ramana Palika ("Plaintiff Palika") is a resident of Texas and a welder by trade. Plaintiff Palika was induced by Defendants to leave Mumbai, India on or about February 15, 2007 to work for Defendant Signal in Orange, Texas.

45. Plaintiff Nesamony Wilson Robi ("Plaintiff Robi") is a resident of Texas and a pipefitter by trade. Plaintiff Robi was induced by Defendants to leave Mumbai, India on or about May 6, 2007 to work for Defendant Signal in Orange, Texas. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Robi.

46. Plaintiff Ragukumar Chinnian ("Plaintiff Chinnian") is a resident of South Carolina and a welder by trade. Plaintiff Chinnian was induced by Defendants to leave Mumbai, India on or about June 23, 2007 to work for Defendant Signal in Pascagoula, Mississippi. Upon arrival in the United States, Defendant Signal refused to employ Plaintiff Chinnian.

<u>Defendants</u>

*Defendant Signal*

47. Upon information and belief, Defendant Signal International LLC is a corporation organized under the laws of Delaware and a provider of marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas; Pascagoula, Mississippi; and Mobile, Alabama.

48. Upon information and belief, Defendant Signal International Texas, G.P. is a general partnership organized under the laws of Texas and employed the labor for Signal International LLC and Signal International, Inc. at the Texas Labor Camp.

49. Upon information and belief, Defendant Signal International Texas, L.P. is a limited partnership of Signal International, L.L.C. and Signal International Texas, G.P. and is organized under the laws of Texas.

50. Upon information and belief, Defendant Signal International, Inc. is a corporation organized under the laws of Delaware and a provider of marine and fabrication services in the Gulf Coast region, with operations in Orange, Texas; Pascagoula, Mississippi; and Mobile, Alabama.

51. Defendants Signal International L.L.C., Signal International, Inc., Signal International Texas, G.P., and Signal International Texas, L.P. will be referred to collectively as "Signal".

52. Upon information and belief, all policies, money for payroll, corporate governance and legal advice for Defendant Signal International Texas, G.P. was provided by Signal International L.L.C.

53. Upon information and belief, all policies, money for payroll, corporate governance and legal advice for Defendant Signal International Texas, L.P. was provided by Signal International L.L.C.

54. Upon information and belief, Defendant Signal does distinguish the roles of the Signal entities including, but not limited to, which entity paid Plaintiffs.

55. Upon information and belief, Defendant Signal International L.L.C. executed contracts relevant to this Complaint in the name of Signal International, Inc.

56. Upon information and belief, Defendant Signal did not document which entity employed Plaintiffs.

57. Upon information and belief, Defendant Signal International, Inc. is the sole member of Defendant Signal International L.L.C.

58. Upon information and belief, Defendants Signal International L.L.C. and Signal International, Inc. are and function as the alter egos of Signal International Texas, G.P. and Signal International Texas, L.P.

59. Upon information and belief, Defendant Signal paid the Indian H-2B Workers at the Texas Labor Camp through a Texas bank account and Texas payroll account, and the Indian H-2B Workers at the Mississippi Labor Camp through a Mississippi bank account and Mississippi payroll account.

*Recruiter Defendants*

60. Defendant Global Resources, Inc. ("Global") is, or at all relevant times, was, a corporation organized under the laws of Mississippi and engaged in the business of recruiting workers from India, including Plaintiffs, for employment in Texas and Mississippi. Global entered into contracts with Defendant Signal, Burnett Defendants (defined below), Dewan Defendants (defined below), and Plaintiffs for labor to be provided in Signal's Texas and Mississippi Labor Camp. Upon information and belief, Global recruited Plaintiffs for employment within Texas and Mississippi. Upon information and belief, Global committed tortious conduct in Texas and Mississippi. Michael Pol was the President of Global throughout the relevant period and acted on behalf of the corporation in its dealings with Defendants and Plaintiffs.

61. Defendant Dewan Consultants Pvt. Ltd. (a/k/a Medtech Consultants) ("Dewan Consultants") is a private limited liability company organized under the laws of India, which maintains offices in Mumbai (Bombay), India, and Dubai, United Arab Emirates. Defendant Dewan Consultants entered into contracts with Defendant Signal, Burnett Defendants, Michael Pol and Defendant Global, and Plaintiffs for labor to be provided in Signal's Texas and Mississippi Labor Camps. Dewan Consultants recruited Plaintiffs for employment within Texas and Mississippi. Upon information and belief, Defendant Dewan Consultants committed tortious conduct in Texas and Mississippi.

62. Defendant Sachin Dewan ("Dewan") is the Director of Dewan Consultants. Dewan resides in India. Dewan entered into contracts with Defendant Signal, Burnett Defendants, Michael Pol and Defendant Global, and Plaintiffs for labor to be provided in Signal's Texas and Mississippi Labor Camps. Dewan recruited Plaintiffs for employment within Texas and Mississippi. Upon information and belief, Dewan committed tortious conduct in Texas and Mississippi.

63. Upon information and belief, Defendants Dewan and Dewan Consultants ("Dewan Defendants") authorized and utilized Defendant Global, and Burnett Defendants to act a their United States-based operations and/or agents.

64. Upon information and belief, Defendant Global, Burnett Defendants and Defendant Signal authorized and utilized Defendants Dewan and Dewan Consultants to act as their India and United Arab Emirates based operations and/or agents.

65. Upon information and belief, Defendants Dewan, Dewan Consultants, Michael Pol and Defendant Global, and Burnett Defendants, acted as a joint venture with respect to the recruitment, contracting, and retention of Plaintiffs for the provision of labor or services.

66. Defendants Global, and Burnett Defendants, utilized Defendants Dewan and Dewan Consultants to conduct and carry out their shared business interests and activities in India and the United Arab Emirates. Among other things, Defendant Global shared offices with Defendants Dewan and Dewan Consultants in India and the United Arab Emirates.

67. Upon information and belief, Defendants Dewan and Dewan Consultants utilized Defendant Global, and Burnett Defendants, to conduct and effectuate their shared business interests and activities in the United States.

68. Throughout this Complaint, Plaintiffs refer to Defendants Dewan, Dewan Consultants, and Defendant Global, collectively as "Recruiter Defendants."

*Legal Facilitator Defendants*

69. Defendant Malvern C. Burnett ("Burnett") is an attorney who resides and maintains offices in New Orleans, Louisiana and Ocean Springs, Mississippi.

70. Defendant Gulf Coast Immigration Law Center L.L.C. ("GCILC") is a limited liability corporation organized under the laws of Louisiana and located in New Orleans, Louisiana. Upon

information and belief, Defendant Burnett serves as GCILC's sole registered agent, member, and/or corporate officer.

71. Defendant Law Offices of Malvern C. Burnett, A.P.C. ("Burnett Law Offices") is a professional law corporation organized under the laws of Louisiana and located in New Orleans, Louisiana. Upon information and belief, Defendant Burnett serves as its sole registered agent, member, and/or corporate officer.

72. Upon information and belief, Defendants Burnett, GCILC, and Burnett Law Offices are engaged in a joint venture or are alter egos in that all entities have the same corporate mailing address, intermingle business assets, do not operate at arms' length, and Defendant Burnett serves as the registered agent and sole member or corporate officer for GCILC and Burnett Law Offices.

73. Upon information and belief, Defendant Burnett, GCILC, and the Burnett Law Offices have the same business objectives, and Defendant Burnett uses GCILC and the Burnett Law Offices to conduct and effectuate shared business objectives.

74. Throughout this Complaint, Plaintiffs refer to Defendants Burnett, GCILC, and Burnett Law Offices collectively as "Legal Facilitator Defendants".

75. The Legal Facilitator Defendants engaged in a joint venture with Kurella Rao and Indo-Ameri Soft, L.L.C., described below, to conduct and carry out their shared business interests and activities in India and the United Arab Emirates.  This joint venture is in addition to the joint venture described above between the Legal Facilitator Defendants and the Recruiter Defendants.

*Labor Broker Defendants*

76. Defendant Indo-Ameri Soft, L.L.C., ("Indo-Ameri Soft") a corporation organized under the laws of Louisiana and headquartered in New Orleans, Louisiana, with substantial business contacts in Texas, is engaged in the business of recruiting and providing Indian laborers to United

States companies and selling opportunities for United States immigration and employment to such laborers.

77. Defendant Kurella Rao ("Rao") is the Chairman and Director of Indo-Ameri Soft, L.L.C., and maintains offices in the New Orleans, Louisiana metropolitan area. Rao has substantial business contacts in Texas.

78. Defendant J & M Associates of Mississippi, Inc. ("J & M"), a corporation organized under the laws of Mississippi with substantial business contacts in Texas, was at all relevant times engaged in the business of recruiting and providing Indian laborers to United States companies and selling opportunities for United States immigration and employment to such laborers.

79. Defendant Billy R. Wilks ("Wilks") was the founder and general manager of J & M and currently acts as a consultant for the company. Wilks has substantial business contacts in Texas. Wilks is personally liable for the conduct of J & M.  Discovery in the case of *David, et al. v. Signal, et al.,* United States District Court for the Eastern District of Louisiana (Civ. No. 08-1220 SM/DEK) (the "David Litigation") has established that Wilks had full control and decision-making authority over J & M such that J & M and Wilks were alter egos of one another.

80. Wilks is the founder of J & M. He incorporated it in 1996. The main corporate office of J & M is Wilks' home. J & M, during the time relevant to this litigation, was entirely beholden to Wilks for its business activity. Further, Wilks has testified that during the time relevant to this litigation all of J & M's decisions and policy changes would have to be approved by him. He was the main decision-maker with regard to all of the company's relevant business activity. Both Wilks and his former lawyer describe Wilks as the only person who knows anything about the company and that it is indeed his company, although in fact Wilks' sons participated in the conduct of the company.

81. At some point prior to 2007, J & M was sued in unrelated litigation. In response to that lawsuit, Wilks set up a new corporation – J & M Marine & Industrial, LLC ("J & M Marine") – primarily to avoid the litigation then pending against J & M, but also to continue the work that was underway with J & M.

82. Wilks used the contractual arrangements and relationships he had set up between J & M and the Recruiter Defendants to create profitable opportunities for his new J & M Marine entity. In other words, Wilks harvested the value that remained in J & M and transferred it to J & M Marine with no regard to the independent corporate identity of J & M. Such a transition is not reflective of the action of a corporate entity; rather, it indicates an action done for the convenience and singular strategy of the principal, Wilks.

83. In 2007, Wilks put J & M into dormancy. This purported change of corporate status was, upon information and belief, done without any formal shareholder vote or board member meeting. Further, J & M is undercapitalized; it has, according to Wilks, approximately $300,000 in debt. Further, Wilks, in yet another indication of the absence of corporate formalities between him and J & M, has represented to the Court in the *David* Litigation that he intends to borrow money so that he is able to personally fund J & M's legal defense.

84. J & M filed a "Notice to Dissolve/Revoke" with the Mississippi Secretary of State on September 12, 2010, although it remained in good standing through December 2012 according to the Mississippi Secretary of State's Business Services website.

85. In short, there is no independence between Defendant Wilks and J & M. J & M was simply used as the corporate entity to facilitate Wilks' personal business and that of his family. He testified during his deposition in the *David* Litigation that he did everything for the company. Indeed, prior to incorporating J & M in 1996, Wilks was doing the exact same work, as the 100% owner, under

a "doing/business/as" rubric. Once Wilks incorporated J & M in 1996, there was no change to the company activity or purpose, and J & M certainly did not obtain an identity independent from its founder.

86. Once Wilks created J & M Marine, he simply shifted his employee, Nicole Homel-Tellier, from J & M over to J & M Marine. As he had done with J & M, he listed himself as the registered agent and his home address as the company's principal address with the Mississippi Secretary of State.

87. Both J & M and J & M Marine clearly share the same initials, which reference the same individuals: John and Michael Wilks.

88. Both corporations perform the same work: recruit laborers to then subcontract them out to other companies for a profit. Given both entities were in the same business and both operated out of the same address, it is likely that whatever assets were held by J & M (e.g., computers, printers, etc.) were at the disposal of J & M Marine both during the time that both companies existed and also once J & M was put into dormancy.

89. More importantly, with respect to the "asset" crossover between the two companies, Defendant Wilks moved the laborers – plaintiffs and other similarly situated – from J&M, with which they contracted, over to J & M Marine. In other words, the very revenue source of J & M became the revenue for J & M Marine.

90. In bringing the candidates over to J & M Marine, after they had signed contracts with J & M, Defendant Wilks was unequivocally holding J & M Marine out as the successor company of J & M. Further, this transition of recruits, in conjunction with avoiding the litigation then pending against J & M, exemplifies the taking of the benefits of the predecessor company while leaving its liabilities behind. Wilks acknowledges that J & M has a $100,000 judgment against it, an obvious

liability that has not tracked across to J & M Marine.

91. Throughout this Complaint, Plaintiffs refer to Defendants Indo-Ameri Soft, Rao, J & M, Wilks and J & M Marine collectively as the "Labor Broker Defendants."

*All Defendants*

92. At all relevant times, Defendants Dewan, Dewan Consultants, Global Resources, Burnett, Burnett Law Offices and GCILC acted as agents of Defendants Signal, J & M, Indo-Ameri Soft and/or Rao for the purposes of recruiting, obtaining, contracting, transportation and/or providing Plaintiffs for labor or services.

93. All Defendants acted together in a joint venture in committing the wrongful actions described herein.

94. The actions of the Recruiter Defendants and Legal Facilitator Defendants described herein were performed within the scope of their agency to Signal.

95. Individually and through their agents, associates, attorneys, and/or employees, all Defendants have significant contacts in or around Orange, Texas.

96. At all relevant times, Defendants were "persons" within that term as defined by RICO, 18 U.S.C. § 1961(3).

97. Upon information and belief, Defendants have been engaged in contacts with Plaintiffs, including recruiting, obtaining, labor contracting, providing immigration related services to, transporting, harboring, providing and/or employing Plaintiffs.

98. At all relevant times, Defendants operated enterprises engaged in interstate commerce or in the production of goods for interstate commerce.

## STATEMENT OF FACTS

### The Recruitment Process

#### Recruitment of the Plaintiffs and Other Workers

99. Beginning in 2003 and continuing through 2006, Recruiter Defendants (Defendants Dewan, Dewan Consultants, and Global Resources) placed ads in various newspapers across India and the United Arab Emirates, seeking welders, fitters, and other marine fabrication workers on behalf of U.S.-based companies and individuals, including Labor Broker Defendants (Defendants Indo-Ameri Soft, Rao, and J & M), and Signal Defendants.

100. Upon information and belief, Recruiter Defendants placed such ads in coordination and agreement with Legal Facilitator Defendants (Defendants Burnett, GCILC, and Burnett Law Offices), and Labor Broker Defendants.

101. Upon information and belief, since at least December 2003 through at least mid-2004, Legal Facilitator Defendants and Labor Broker Defendants frequently communicated and consulted frequently via mail, fax, e-mail and/or telephone communications to coordinate and direct Recruiter Defendants' activities, including a first-round of advertising efforts on behalf of Labor Broker Defendants.

102. The advertisements placed by Recruiter Defendants promised that qualified candidates could obtain legal permanent residence (green cards) and thereby legally and permanently immigrate to the United States with their families.

103. In response to these advertisements, Plaintiffs contacted Recruiter Defendants by telephone, and/or attended meetings and testing sessions organized by Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants and their agents, employees and/or representatives at several locations throughout India and the United Arab Emirates.

104. Specific facts relevant to the experiences of Plaintiffs are set forth in the "RICO Fraud Chart" attached to this Complaint as Exhibit 1, which is incorporated herein by reference.

105. Upon information and belief, prior to attending these meetings and testing sessions, Labor Broker Defendants, Recruiter Defendants, and Legal Facilitator Defendants conferred in late 2003 and early 2004 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these meetings and testing sessions.

106. In telephone communications, in-person meetings, faxes, contracts, and other written documents transmitted by mail and/or wire in 2004, Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants personally and through employees, agents and/or associates, told Plaintiffs that if Plaintiffs successfully passed skills tests administered in the United Arab Emirates or India and paid fees totaling approximately 5 Indian lakh rupees then Plaintiffs would be able to apply for permanent resident (green card) status in the United States with Labor Broker Defendants.

107. In these communications occurring during 2004, Recruiter Defendants and Legal Facilitator Defendants further explained to many of the Plaintiffs, as reflected in the attached Exhibit 1, that the installment payments would be divided among Recruiter Defendants and Legal Facilitator Defendants.

108. In these communications occurring during 2004, Recruiter Defendants, Labor Broker Defendants, and Legal Facilitator Defendants further explained to Plaintiffs that the installment payments would be divided among Recruiter Defendants, and one of the two Labor Broker Defendant entities.

109. In telephone communications, in-person meetings, faxes, written contracts, and/or other written communications, transmitted, upon information and belief, by mail and/or wire in 2004,

Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants instructed Plaintiffs that the total fees would be paid in a series of approximately three installments.

110. In these conversations in 2004, Recruiter Defendants and/or Legal Facilitator Defendants communicated to Plaintiffs that Plaintiffs would be able to obtain legal permanent residence for their spouses and children for an additional fee.

111. At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through 2004, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants, personally and/or through their agents, representatives, and/or employees, represented to Plaintiffs that Labor Broker Defendants were stable and reputable U.S. companies offering lawful and ample employment opportunities, and that Labor Broker Defendants would obtain for Plaintiffs green cards enabling Plaintiffs to permanently and legally immigrate to the United States with their family members.

112. At informational meetings and in telephone conversations, faxes, contracts, and other written documents transmitted in late 2003 through 2004, the Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants, personally and/or through their agents, employees and/or representatives, told Plaintiffs that the green card process, once commenced, would be completed within18 to 24 months.

113. In such communications with Plaintiffs, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants further promised to act diligently and do everything necessary to obtain green cards for Plaintiffs in the timelines stipulated.

114. Based on these and other contractually-binding promises made to them regarding green cards and work opportunities in the United States, Plaintiffs entered into contracts (hereinafter "the green card contracts") at various times in 2004 with Recruiter Defendants, Legal Facilitator

Defendants, and Labor Broker Defendants.

115. Upon information and belief, contracts signed by Plaintiffs and other documents provided to the Plaintiffs by Legal Facilitator Defendants, Recruiter Defendants, and Labor Broker Defendants through the use of mail and/or wire transmissions in 2004, further promised that Plaintiffs would promptly receive a refund of all or nearly all of their payments if these Defendants did not succeed in securing green cards for Plaintiffs as promised.

116. Legal Facilitator Defendants, Recruiter Defendants, and Labor Broker Defendants knew or should have known that they would not refund Plaintiffs' money as promised in the contracts and other documents.

117. Legal Facilitator Defendants, Recruiter Defendants and Labor Broker Defendants induced the Plaintiffs to enter into the green card contracts: (a) without intent to diligently pursue Plaintiffs' green card applications; and (b) knowingly without any basis whatsoever for representing, inter alia: (i) that the companies and/or entities purportedly sponsoring Plaintiffs' applications were financially solvent and had reliable and stable employment opportunities to provide Plaintiffs; (ii) that green card applications sponsored by such companies would be valid and bona fide under U.S. immigration law; (iii) and that such applications were likely to be successfully completed and approved within the promised timelines.

118. In reasonable reliance on Legal Facilitator Defendants, Recruiter Defendants and Labor Broker Defendants' explicit and repeated promises regarding green cards, family members' ability to immigrate to the United States, and lawful and legitimate employment opportunities in the United States, Plaintiffs undertook considerable economic, social, familial and personal sacrifices, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees.

119. Plaintiffs signed contracts with Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants and made the first round of installment payments required by these contracts.

120. After Plaintiffs signed contracts with Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants and paid the first installment payments required by the contracts, these Defendants failed to provide Plaintiffs with updates regarding the progress of their green card applications for extended periods of time.

121. When Plaintiffs contacted Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants by phone, mail, and/or e-mail at various times between the last half of 2004 and mid-2006 to check on the progress of their green card applications, these Defendants assured them that the green card process was going forward.

122. While awaiting the processing of their green cards, many of these Plaintiffs continued to incur substantial interest on the money they had borrowed for the purpose of making the first installment payment to these Defendants.

123. In or around January 2006, Recruiter Defendants, Legal Facilitator Defendants and Labor Broker Defendants, personally and/or through their agents, employees and/or representatives notified Plaintiffs via telephone, e-mail, and/or mail communications that the labor certification required for their green card applications had been approved by the U.S. government.

124. After this notification, Recruiter Defendants, Legal Facilitator Defendants and Labor Broker Defendants used wire and/or mail communications to collect the second and/or third installment payments from the Plaintiffs.

125. By spring 2006, after the 18 to 24 month processing period promised by Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants had elapsed, the Plaintiffs

had still not received their green cards.

126. By spring of 2006, Recruiter Defendants, Legal Facilitator Defendants, and Labor Broker Defendants had yet to refund Plaintiffs' payments as promised by Plaintiffs' green card contracts.

127. Upon information and belief, in the course of telephone, fax, e-mail and/or mail communications occurring in or around April or May 2006, Defendant Signal authorized Recruiter Defendants to act as their agents in India and the United Arab Emirates for the purposes of recruiting Indian welders and fitters to fill the anticipated H- 2B guestworker jobs at Signal operations.

128. Upon information and belief, in the course of these communications, Defendant Signal further authorized Recruiter Defendants and Legal Facilitator Defendants to represent that Signal would assume sponsorship of the pending and as-yet-unsuccessful green card applications on behalf of, among others, Plaintiffs.

129. In addition, beginning in 2006, Recruiter Defendants (Defendants Dewan, Dewan Consultants, and Global Resources) placed ads in various newspapers across India and the United Arab Emirates, seeking welders, fitters, and other marine fabrication workers on behalf of Signal.

130. Recruiter Defendants' advertisements and other recruiting efforts were undertaken on behalf of, at the direction of, and/or in coordination and consultation with Defendant Signal and the Legal Facilitator Defendants.

131. In response to the advertisements posted by Recruiter Defendants, Plaintiffs contacted Recruiter Defendants in spring, summer and fall 2006 via telephone and in-person meetings.

132. At the same time, Plaintiffs who had already initiated the green card process and made payments to the Labor Broker Defendants were told by Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants that Signal would sponsor their visas to the United

States for an additional sum and they could quickly obtain H-2B visas to go to the United States for work at Defendant Signal's operations and their green cards would be processed while they worked at Signal.

133. Plaintiffs, unaware of U.S. immigration law and the temporary, nonimmigrant character of H-2B visas and desperate not to forfeit the substantial fees that they had already paid, agreed, in reliance on the representations of Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants, to transfer their green card applications to Defendant Signal's sponsorship and further agreed to work for Defendant Signal under H-2B visas pursuant to the terms explained by Recruiter Defendants.

134. In late May and early June of 2006, the Legal Facilitator Defendants, on behalf of Defendant Signal filed with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor by mail, electronic transmission, and/or fax the completed forms ETA 750 and attachments seeking permission to import and hire 590 foreign guestworkers under the auspices of 8 U.S.C. § 1101(a)(15)(H)(ii)(b), attendant regulations 8 C.F.R. § 214.2(h)(6) and 20 C.F.R. § 655.3, and associated administrative letters and/or guidance (commonly known as "the H-2B guestworker program").

135. Knowing that Signal's labor need was projected to be at least two to three years, the Legal Facilitator Defendants and Defendant Signal stated in these applications to the state workforce commissions and in forms ETA 750 that Signal would employ workers from October 1, 2006 to July 31, 2007. These applications were furnished with signatures by Signal executives swearing, under penalty of perjury, to the veracity of the information in these applications.

136. Defendant Signal sought these workers to perform various jobs essential to its marine fabrication services business, including welding and fitting, in Orange, Texas and Pascagoula,

Mississippi.

137. On information and belief, Defendant Signal, despite knowing the specific type of work to be performed by the H-2B guestworkers, misclassified the jobs as production occupations where those jobs should be classified under the construction trades occupation based on the work actually to be performed by the H-2B guestworkers.

138. On information and belief, Defendant Signal recruited these workers, including the Plaintiffs, and offered terms of employment to these workers from its operations in Orange, Texas and Pascagoula, Mississippi.

139. The H-2B guestworker program permits U.S. employers to import foreign workers on short-term temporary visas to meet labor needs in specified job trades when employers attest that they cannot find U.S. workers to perform the available jobs in the local area where the employer seeks to employ the guestworker.

140. H-2B visas are non-immigrant visas, are only valid for work with the specific employer listed on the visa, and do not provide portable and/or transferable employment authorization for the visa bearer.

141. H-2B visas require employers to pay H-2B guestworkers a minimum wage, which is determined by, among other things, the location where the guestworker will work, the type of work done by the guestworker, and the experience or skill level of the guestworker.

142. Defendant Signal stated in the ETA 750 forms that its need for H-2B guestworkers was "peak load and a one-time occurrence" and that "the temporary workers will work for the length of the prescribed dates of need, will be paid in accordance with the prevailing wage, and will return to their home country at the end of employment."

143. In the ETA 750 forms, Defendant Signal named Legal Facilitator Defendants as its agents

for the purposes of preparing and submitting these applications to import H-2B guestworkers. Legal Facilitator Defendants prepared and submitted these applications on behalf of Signal.

144. At the time of filing the ETA 750 forms and attachments with the Mississippi Department of Employment Security, the Texas Workforce Commission, and the United States Department of Labor, Defendant Signal and the Legal Facilitator Defendants knew that Signal projected the labor need that it sought to fill with foreign workers to be at least two to three years.

145. Defendant Signal and Legal Facilitator Defendants, at or around the time they filed the ETA 750 forms in May and June 2006, repeatedly communicated by telephone, mail, e-mail, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs. Upon information and belief, Signal and/or Legal Facilitator Defendants repeatedly communicated with Recruiter Defendants and Labor Broker Defendants by telephone, mail, e-mail, and/or fax to direct and coordinate recruitment of Indian workers to fill the anticipated H-2B guestworker jobs.

146. Upon information and belief, in the course of these communications, Defendant Signal further authorized Recruiter Defendants and Legal Facilitator Defendants to represent that Signal would apply for at least two to three H-2B visa extensions on behalf of all the Indian H-2B workers, including Plaintiffs, to allow them to remain in the United States working for Signal while Plaintiffs' green card applications were being processed.

147. Defendant Signal authorized its agents to make these representations even though it knew or had reason to know that such visa extensions and green card applications would not be bona fide and valid under United States immigration law. Moreover, Defendant Signal authorized its agents to make these misrepresentations even though it did not have the intention at that time to apply for such visa extensions and/or green cards on behalf of all of the Indian H-2B workers,

including Plaintiffs.

148. In July and August of 2006, with specific dates and assertions as set out in Ex. 1, the Legal Facilitator Defendants on behalf of Defendant Signal filed with the United States Citizenship and Immigration Service by mail, electronic transmission, and/or fax the completed I-129 forms and attachments seeking 590 H-2B visas.

149. Knowing that Signal's labor need was projected to be at least two to three years, in these H-2B visa applications Defendant Signal attested to a 10-month labor need running from October 1, 2006 – July 31, 2007. Signal falsely represented to the government that at the end of this 10 month period, it intended to return all H-2B workers back to India. The Legal Facilitator Defendants declared that the applications were based on all information of which Defendant Burnett had any knowledge despite the fact that the Legal Facilitator Defendants believed that Signal's intentions for these workers exceeded ten months.

150. Upon information and belief, Defendant Signal authorized Recruiter Defendants and Legal Facilitator Defendants to act as their agents for the purposes of recruiting and providing Indian welders and fitters to fill anticipated H-2B guestworker jobs at Signal operations.

151. Defendant Signal, Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants falsely assured Plaintiffs that Defendant Signal would seek at least two extensions of the temporary H-2B visas with which Plaintiffs would gain admittance to the United States, and that Plaintiffs' H-2B visas would thereafter be converted to permanent green cards.

152. Upon information and belief, prior to these communications with Plaintiffs, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal communicated and consulted frequently via mail, fax, e-mail and/or telephone communications regarding the issues to be discussed and representations to be made to Plaintiffs.

153. In their communications with Plaintiffs, Defendant Signal, Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants further failed to disclose material facts regarding the H-2B visa, including the fact that H-2B visas confer only a temporary non-immigrant status which does not allow the bearer to adjust to permanent residency status and the fact that applying for H-2B visa status is fundamentally incompatible with simultaneously applying for a green card.

154. In reliance on the representations of Recruiter Defendants, Legal Facilitator Defendants, Labor Broker Defendants and Defendant Signal, Plaintiffs and others similarly situated entered the United States on H-2B guestworker visas in late 2006 and early 2007 for the purposes of working for Defendant Signal at its Orange, Texas facility or Pascagoula, Mississippi facility.

155. On or about July 20, 2006 and August 17, 2006, the United States Department of Labor approved Signal's labor certification applications for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

156. In approving these labor certification applications, the United States Department of Labor relied on the accuracy of the applications' stated 10-month period of labor need.

157. On information and belief, the Department of Labor is prohibited by its internal guidelines to grant labor certification applications without relying on the application's statement of temporary labor need.

158. In late August and early September 2006, the United States Citizenship and Immigration Service approved Signal's H-2B visa petitions for 590 H-2B workers for the period of October 1, 2006 through July 31, 2007.

159. In approving these visa petitions, the United States Citizenship and Immigration Service relied on the accuracy of the petitions' stated 10-month period of labor need and the representation

that Defendant Signal's need was based on a one time peak-load temporary demand for the work listed in the applications.

160. The United States Citizenship and Immigration Service must, according to regulation, rely on the stated period of the petitioner's labor need, see 8 C.F.R.214.2(h)(6)(ii)(B) (2006).

161. Defendant Signal, Legal Facilitator Defendants, and Recruiter Defendants knew that the stated period of need in Signal's applications for labor certifications and for H-2B visas were inconsistent with Signal's projected actual labor need and therefore Defendants knew these statements to the government were false.

162. The Recruiter Defendants and the Legal Facilitator Defendants used the H-2B visas, obtained from the U.S. Government on the basis of false statements by Defendant Signal and the Legal Facilitator Defendants, to elicit multiple installment payments Plaintiffs.

163. Plaintiffs would not have paid the extraordinary fees charged by Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Broker Defendants for travel, green cards, visas, and work opportunities had they known that these Defendants' promises and representations were false.

164. Plaintiffs would not have paid the extraordinary fees charged by the Recruiter Defendants, Legal Facilitator Defendants, and/or Labor Brokers Defendants for travel, green cards, visas, and employment opportunities had they known that these Defendants had failed to disclose material facts concerning the nature and terms and conditions of the immigration and work opportunities offered.

165. Had Plaintiffs not paid the extraordinary fees, Defendant Signal would have had to pay the recruitment, travel, green card, visa and other costs necessary to recruit and employ the H-2B guestworkers or other workers to fill the positions.

Preparations and Departure for Signal Operations in the United States

166. At various times from the spring of 2006 to early 2007, employees of Defendant Signal traveled to various locations in India and the United Arab Emirates and tested Plaintiffs' welding and pipefitting skills in anticipation of employing them in the United States.

167. Plaintiffs paid costs necessary to travel to the cities where these tests were held.

168. Plaintiffs paid admission fees charged to take these tests.

169. Plaintiffs attended and passed these tests, which were overseen and graded by Defendant Signal's and/or Defendant Dewan's agents, employees, and/or representatives.

170. Upon information and belief, prior to attending these meetings and testing sessions, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants conferred in spring, summer, and fall 2006 by phone, mail, fax and or e-mail to organize, plan, and coordinate the logistics and substantive content of these testing sessions.

171. Plaintiffs entered the United States on H-2B guestworker visas, issued by the U.S. Government on the basis of false statements by Defendant Signal and the Legal Facilitator Defendants, in late 2006 and early 2007 for the purposes of working for Defendant Signal at its Orange, Texas or Pascagoula, Mississippi facility.

172. Around the time of USCIS's visa approval, Plaintiffs made necessary preparations in order to travel to the United States on H-2B visas to work for Signal, including: paying to obtain necessary travel and legal documents, making payments to the United States consulate, Recruiter Defendants and Legal Facilitator Defendants for mandatory H-2B visa and consular processing fees, attending H-2B visa interviews, and paying Recruiter Defendants for travel arrangements.

173. In order to secure H-2B visas to work for Signal, Plaintiffs were required to be interviewed by United States Consular offices in Indian cities.

174. These consular interviews necessitated that Plaintiffs pay the costs of travel from their homes and/or current places of employment to various large Indian cities including Chennai (Madras), Delhi and Mumbai (Bombay).

175. Recruiter Defendants and/or Legal Facilitator Defendants, acting as Defendant Signal's agents, required that Plaintiffs meet with Recruiter Defendants and/or the Legal Facilitator Defendants in these Indian cities prior to attending their consular interviews.

176. Upon information and belief, prior to these meetings Recruiter Defendants and Legal Facilitator Defendants discussed amongst themselves and with Defendant Signal by e-mail, telephone, or in-person communications the topics to be discussed and instructions to be given to Plaintiffs and others similarly situated at these meetings.

177. At these pre-interview meetings, Recruiter Defendants and Legal Facilitator Defendants ensured that Plaintiffs were up-to-date on paying the fee installments required by their green card contracts.

178. Defendants further required that Plaintiffs pay an additional 35,000 to 45,000 rupees ($800 to $1,100) fee for H-2B visa processing.

179. On information and belief, Recruiter Defendants and/or Legal Facilitator Defendants required Plaintiffs to sign documents permitting Defendant Sachin Dewan to receive their visa stamped passports from the Consulate on Plaintiffs' behalves.

180. Recruiter Defendants and/or Legal Facilitator Defendants also coached the Plaintiffs on what to say and what not to say during consular interviews. Those Defendants, inter alia, told Plaintiffs not to say anything about the substantial fees Plaintiffs had been required to pay, not to say anything about expected green cards, and, if asked, to say that Plaintiffs expected to be in the United States for only several months and then would return to India.

181. Recruiter Defendants and/or Legal Facilitator Defendants told Plaintiffs that if they did not follow these instructions regarding the interviews, Plaintiffs would not receive their visas and would forfeit the all moneys they had previously paid to Defendants, in addition to losing their opportunity to permanently immigrate to the United States.

182. During Plaintiffs' consular interviews, the consular officials took Plaintiffs' passports from them.

183. Once Plaintiffs' visas were approved, consular officials sent their passports, with H-2B visas affixed, directly to Defendant Dewan.

184. After receiving word that Plaintiffs' visas were approved, Recruiter Defendants made travel arrangements for Plaintiffs' departures to the United States.

185. Before Plaintiffs could leave for the United States, however, Plaintiffs were required to attend final meetings in Recruiter Defendants' Mumbai (Bombay) office.

186. Such meetings typically took place mere hours before Plaintiffs' scheduled departures to the United States, when Recruiter Defendants' office with large numbers of fellow Indian workers awaiting departure to the United States.

187. At these meetings, Recruiter Defendants collected final installment payments required by Plaintiffs' green card contracts.

188. Recruiter Defendants also required that Plaintiffs, most of whom do not proficiently read or speak English, sign English language documents with little or no time for review.

189. Recruiter Defendants refused to return Plaintiffs' passports -- which had been in Defendant Sachin Dewan's possession since after Plaintiffs' H-2B visas were approved by Consular Officials -- until after Plaintiffs had paid the final installments and signed the mandatory paperwork.

190.  In forceful tones, Recruiter Defendants or their staff demanded that Plaintiffs quickly sign the mandatory documents, lest they miss the flights to the United States which Recruiter Defendants had scheduled for them.

191.  Without possession of their passports and within this rushed and hostile atmosphere, Plaintiffs had no reasonable opportunity to review, negotiate, and/or make any changes to the documents presented them.

192.  On occasions when workers who appeared at the Mumbai office failed to present sufficient funds to pay the final installment required by the green card contracts, Defendant Dewan and his associates threatened to destroy and/or deface these workers' passports.

193.  Such threats were uttered in the presence of other workers, causing these workers to reasonably believe that they had no choice but to pay the final installments in full.

194.  Based on the Recruiter Defendants' threatening and coercive behavior during these pre-departure meetings in Mumbai and the extraordinary and increasing levels of debt they had incurred to pay the Recruiter Defendants and Legal Facilitator Defendants for green card and H-2B visa arrangements, Plaintiffs reasonably believed that they had no choice but to make the payments required by the Recruiter Defendants and to travel to the United States to work for Defendant Signal.

195.  Plaintiffs and approximately 590 other Indian H-2B workers traveled from Mumbai to Defendant Signal's operations in the U.S. at various times from late October 2006 to July 2007 on tickets arranged by the Recruiter Defendants.

196.  Pursuant to Defendant Signal's instructions and arrangements, approximately 300 workers, including one of these Plaintiffs, were sent to Signal's Pascagoula, Mississippi facility, and approximately 290 workers, including these Plaintiffs, were sent to Signal's Orange, Texas

facility upon arrival in the United States, although Signal's Orange, Texas facility began turning away workers in or around February 2007.

197. The Plaintiffs had no choice but to use the Recruiter Defendants and the Legal Facilitator Defendants to secure employment at Defendant Signal's operations.

198. The Plaintiffs had no choice but to pay the fees the Recruiter Defendants and the Legal Facilitator Defendants charged to secure employment at Defendant Signal's operations.

199. Management personnel at Defendant Signal made the conscious and deliberate decision to prohibit the Plaintiffs from securing employment at Signal's operations either through another recruiter or by bypassing recruiters' altogether and applying directly with Defendant Signal.

200. Furthermore, Defendant Signal recruited Plaintiffs Kang, Arunachalam, Ruthirapathi, Maideen, Sequira, Pillai, Kunjupanickan, Robi, and Chinnian  (collectively, "Abandoned Plaintiffs") and did not fulfill its promise to employ them.  On information and belief, Signal continued to recruit Abandoned Plaintiffs knowing that it did not intend to employ Abandoned Plaintiffs.   On information and belief, Signal knew the Abandoned Plaintiffs had incurred substantial debt, given up stable jobs, and travelled half-way across the world.  On information and belief, Signal knew or should have known that the Abandoned Plaintiffs arrived at airports in the United States expecting to be picked up by Signal representatives and Signal did not pick them or notify them that no one was coming to pick them up.  Signal's refusal to employ the Abandoned Plaintiffs was in direct contrast to promises Signal made to the US government in its petition for H-2B visas, and to promises Signal made to the Abandoned Plaintiffs themselves during the recruitment process, and, furthermore, was done because Plaintiffs were Indian nationals.

Conditions at Signal Facilities in Orange and Pascagoula

201. Upon arrival at Defendant Signal's facilities in Orange and Pascagoula, Plaintiffs were

shocked to discover that they were expected to live in isolated, overcrowded labor camps comprised of trailer-like bunkhouses.

202. Defendant Signal's labor camps were located in isolated, industrial areas miles removed from shopping areas, places of worship, and residential communities. The camps were enclosed by fences and accessible only by a single guarded entrance.

203. The Signal labor camp gates at the Texas and Mississippi facilities were constantly monitored by security guards retained by Defendant Signal.

204. Signal's security guards monitored Plaintiffs' comings and goings by requiring them to show their employee identification badges and recording when Plaintiffs entered and exited the camps. Signal's security guards also searched Plaintiffs' packages and bags when they entered the camp.

205. Except on rare occasions, Plaintiffs were not permitted to receive visitors in the Signal labor camps.

206. Up to twenty-four Indian men were housed in each bunkhouse and made to sleep in two-tiered bunk beds. The bunk beds were so tightly packed in the bunkhouses that it was difficult for workers to move about in the narrow passageways between bunks. These housing conditions, inter alia, violated the applicable health and safety standards under the federal Occupational Health and Safety Act.

207. The Signal labor camp bunkhouses had insufficient toileting and bathing facilities for twenty-four men, resulting in long lines for the bathrooms before and after work shifts.

208. Privacy was non-existent, and Plaintiffs often experienced extreme difficulty sleeping due to the constant noise resulting from the close quarters and the comings and goings of workers who worked on different shifts.

209. Defendant Signal's personnel and/or security guards conducted surprise searches of the dormitory areas of the bunkhouses, including searches of workers' personal belongings.

210. Plaintiffs took their meals in Defendant Signal's mess halls, which were only open during limited hours. Due to filthy and unhygienic kitchen conditions and food preparation methods, Plaintiffs frequently became ill.

211. Upon information and belief, Defendant Signal did not obtain the required permit(s) to furnish the board at its Texas Labor Camp, and the condition and sanitation of the board further violated federal, state, and/or local law including, inter alia, the U.S. Food and Drug Administration Code, as adopted and modified by Texas Food Establishment Rules.  In addition, the Mississippi Labor Camp violated Occupational Safety and Health Administration ("OSHA") guidelines on habitability.

212. Defendant Signal deducted labor camp fees of approximately $35 per day ($245 per week, or approximately $1,050 per month) from Plaintiffs' paychecks for these substandard accommodations and meals.

213. When Plaintiffs complained and asked to live outside the labor camps, Defendant Signal initially refused and subsequently told workers that if they tried to live outside the camps Signal would still deduct the labor camp fees from Plaintiffs' wages. As a result, Plaintiffs reasonably felt that they had no choice but to continue living in the Signal camps.

214. Defendant Signal only housed Indian H-2B workers such as Plaintiffs in its labor camps, which employees and management at Signal referred to as the "reservation(s)," in a derogatory play on the common name ("Indian") for Plaintiffs' ethnicity and Native Americans. Upon information and belief, workers of non-Indian descent and United States citizen employees were neither required nor allowed to live in and/or pay for accommodations in Defendant Signal's labor

camps.

215. Defendant Signal subjected Plaintiffs to skills testing and re-testing, on the-job discipline, layoffs, periods without work, lack of safety precautions, unfavorable job assignments, evaluation processes, and other adverse employment actions to which non-Indian and U.S. citizen workers were not similarly subjected.

216. In addition, Signal camp personnel and supervisors frequently subject Plaintiffs to an objectively hostile and abusive environment. They often used offensive language in speaking with and/or referring to Plaintiffs and other Indian H-2B workers and regularly insulted Plaintiffs and other Indian H-2B workers on the basis of their race, national origin, and/or alienage.

217. During the first week of employing Plaintiffs and others similarly situated in the United States, Defendant Signal did not reimburse Plaintiffs and others similarly situated for any of the expenses that Plaintiffs and others similarly situated were required to incur as a pre-condition of seeking employment with Signal.

218. During the first two weeks of employing Plaintiffs and others similarly situated in the United States, Defendant Signal deducted approximately $100 to $200 each week from Plaintiffs' and other similarly situated workers' checks for job-related tool kits which they were required to purchase from Defendant Signal.

219. Prior to and during the course of their employment at Defendant Signal, Plaintiffs and others similarly situated were not informed of the wage which they were legally required to be paid as H-2B guestworkers, nor were they informed of their job classification.

220. During the course of their employment at Defendant Signal, Plaintiffs were not paid the wages required by the H-2B visa program.

221. Over the course of their employment at Defendant Signal, Plaintiffs and others similarly

situated were routinely awarded a fifty cent per hour "safety bonus" for workweeks when they were not written up for violations of Defendant Signal's safety rules.

222. The safety bonus Defendant Signal paid the Plaintiffs and others similarly situated was in addition to their regular hourly wage.

223. Upon information and belief, the safety bonus was non-discretionary with respect both to the decision to pay the bonus and to the amount of the bonus.

224. Defendant Signal paid the safety bonus to the Plaintiffs and others similarly situated pursuant to a prior agreement or promise causing the Plaintiffs and others similarly situated to expect the bonus payments regularly if they met the required safety criteria.

225. During workweeks when the Plaintiffs and others similarly situated worked more than 40 hours, Defendant Signal did not pay one and one-half times the amount of the safety bonus for all overtime hours worked.

226. Signal personnel and management regularly threatened Plaintiffs and other H-2B workers that if they did not continue working for Signal, or did not work according to Signal's specifications, Plaintiffs and other Indian H-2B workers would be deported back to India.

227. In the isolated and guarded atmosphere of the labor camp and grappling with the crushing debts they had incurred to come to the United States, Plaintiffs reasonably felt that Signal's statements were threatening and felt forced to continue working for Signal despite terrible working and living conditions.

228. At regular meetings and in one-on-one or small group conversations with Signal camp personnel and management, some workers, including some of the Plaintiffs, voiced complaints regarding the discriminatory treatment to which Indian H-2B workers were subject. Other similarly situated workers also voiced complaints, in both the Orange and Pascagoula camps.

229. Workers Vijayan and Kadakkarappally, two of the plaintiffs in the *David* Litigation, took leading roles in gathering and voicing others' complaints to Defendant Signal's personnel in camp meetings in Pascagoula.

230. When Indian workers, including Vijayan and Kadakkarappally, voiced grievances regarding housing, food, and wages, Defendant Signal's personnel warned them to stop complaining.

231. When Signal took no action in response to workers' complaints, numerous Indian H-2B workers living at the Pascagoula labor camp, including Vijayan and Kadakkarappally, began meeting collectively to discuss how to persuade Signal to improve conditions in its labor camps, and also began meeting with third parties to discuss how best to address their concerns.

232. Defendant Signal became aware of these meetings, including meetings between workers, including Vijayan and Kadakkarappally, and third parties whom Signal believed to be attorneys.

233. Defendant Signal, through its employees and/or agents, contacted the Recruiter Defendants and Legal Facilitator Defendants to express its concerns about worker organizing efforts and the specific involvement of Vijayan and Kadakkarappally.

234. Upon information and belief, during these conversations Recruiter Defendants, Legal Facilitator Defendants, and Signal reached an agreement regarding steps that they would take to discourage further worker organizing efforts and to ensure that the majority of the Indian H-2B workforce continued to work at Signal without complaint, as well as to prevent the Indian H-2B workforce from exercising their legal rights.

235. Upon information and belief, Signal management and camp personnel conferred and planned internally and with the private Swetman security firm in Mississippi to respond to workers' organizing activities and to take actions to ensure that the majority of the Indian H-2B

workforce continued to work at Signal without complaint, as well as to prevent the Indian H-2B workforce from exercising their legal rights.

236. On or about March 7, 2007, Defendant Sachin Dewan called Vijayan's wife at her home in India and warned her that Vijayan must stop making trouble at Signal.

237. Vijayan's wife informed Vijayan of this call, and Vijayan called Defendant Dewan on or about March 8, 2007. During that conversation, Defendant Dewan told Vijayan that Dewan had learned from Defendant Signal that Vijayan was organizing the workers and making trouble. Defendant Dewan told Vijayan that if the organizing continued, all the workers would be sent back to India.

238. Vijayan informed other Indian workers about the calls he and his wife had received from Defendant Dewan, and word spread quickly through the Pascagoula and Orange camps and to these Plaintiffs, regarding the threats against Vijayan.

239. News about the calls between Defendant Dewan, Vijayan and Vijayan's wife substantially heightened the reasonable fears of Plaintiffs in the Orange camp that if they complained about or tried to leave the discriminatory and substandard working and living conditions at Signal, the Recruiter Defendants, Legal Facilitator Defendants, and Signal would retaliate against Plaintiffs or their families with acts of violence or by arranging for Plaintiffs' deportation to India.

240. Defendant Signal called a workforce-wide meeting on or about March 8, 2007 in the Pascagoula camp, attended by Signal management and Defendant Burnett.

241. At this meeting, Signal management told the Pascagoula workers that Signal would fight back against organizing efforts by the workers.

242. Signal management further threatened that Signal would not extend Plaintiffs' and all

other Indian H-2B workers' visas if any of the workers took legal action against Signal. At that same meeting Defendant Burnett told the workers that they were ineligible for other kinds of immigration relief and could depend only on Signal to maintain their H-2B immigration status and pursue their green card applications. These threats were promptly reported to the workers in Orange, including Plaintiffs.

243. At or about the same time as this camp-wide meeting in Pascagoula, Mississippi, Signal management made the decision to terminate and forcibly deport Vijayan and Kadakkarappally, along with Kuldeep Singh, Kumar, and Chellappan, three Pascagoula workers who are also plaintiffs in the *David* Litigation, and to do so by means that would make an example of them for the other Indian workers in Pascagoula and in Orange, in order to keep those workers in line.

244. Early on the morning of March 9, 2007, Signal locked the gate to its Pascagoula labor camp, thereby obstructing the sole means of direct entry to and exit from the camp.

245. Around this same time, Signal camp coordinator Darrell Snyder, and approximately five security guards, some or all of whom were obtained through the private Swetman Security firm, swept through the bunkhouses carrying pictures of Vijayan, Kadakkarappally, K. Singh, Kumar, and Chellappan.

246. Security guards began accosting workers to determine whether they were the individuals shown in the pictures.

247. Plaintiffs and other Indian H-2B workers at both camps became increasingly frightened and confused by these activities, particularly when word spread that Signal had locked the gate that served as the sole exit from the Pascagoula labor camp.

248. Around 5:15 AM that morning, Vijayan was walking towards the dining area. A security guard and Darrell Snyder, a Signal employee, aggressively confronted Vijayan and instructed him

*Third Amended Complaint*                                                                                           43

that he was in their custody.

249. Based on the threats made at the meeting on March 8, 2007 and Vijayan's recent phone call with Sachin Dewan, Vijayan feared what Defendant Signal might do to him.

250. Vijayan began to panic, thinking of the enormous quantity of money he had spent to come to the United States and the massive debts he owed in India. Vijayan knew that he would not be able to repay such debts if he were deported and no longer employed by Signal.

251. These feelings, combined with Vijayan's reasonable fear that Snyder and the security guards might physically hurt him, drove Vijayan to attempt suicide. Vijayan had to be transported from the labor camp to a local hospital for immediate medical attention.

252. While attempting to assist Vijayan in obtaining medical attention, Kadakkarappally was grabbed by Darrell Snyder and/or one or more of the security guards.

253. Kadakkarappally was taken forcefully by the arm and marched into a communal room in the labor camp referred to by workers as "the TV room."

254. Upon arriving in the TV room, Kadakkarappally found two workers already held inside. Earlier that morning, Darrell Snyder and the security guards had grabbed Chellappan in the communal eating area and Kumar in his bunkhouse and forced both of them into the TV room, where they were kept under guard and prevented from leaving.

255. In the TV room, Darrell Snyder informed Kadakkarappally that he and Kumar and Chellappan were fired and would be taken to the airport to be deported to India. Snyder demanded that Kadakkarappally stay inside the TV room, and Kadakkarappally was prevented from leaving the TV room by security guards.

256. Kuldeep Singh, upon realizing Snyder and the security guards were looking for him and intended to apprehend and detain him, hid himself and later fled the camp via an adjacent work

area.

257. Kadakkarappally, Kumar, and Chellappan were detained in the TV room, under guard, from approximately 6 a.m. for several hours.

258. Several security guards watched over Kadakkarappally, Kumar, and Chellappan while they were detained. Over the course of several hours, security guards denied Kadakkarappally, Kumar, and Chellappan's repeated requests to be let out of the TV room, to get something to drink, or to use the bathroom.

259. When Kadakkarappally, Kumar, and Chellappan's co-workers attempted to come into the TV room to talk to the three workers kept inside, the security guards pushed them back.

260. Confused and frightened, workers assembled outside the TV room to protest the treatment of Kadakkarappally, Kumar, and Chellappan.

261. At around 10 AM, Signal camp personnel finally permitted Kadakkarappally, Kumar, and Chellappan to use the bathroom accompanied by security guards, one at a time.

262. Around noon, Darrell Snyder and a Pascagoula police officer entered the TV room and the officer questioned why Kadakkarappally, Kumar, and Chellappan were there. Snyder said that these workers had been fired and would be sent back to India.

263. By early afternoon on March 9, 2007, local media, religious advocates, and other individuals had gathered outside the camp gate to express their concern over the attempted suicide of Vijayan and the forced detention of Kadakkarappally, Kumar, and Chellappan.

264. Faced with growing protests by community members and Signal employees, Defendant Signal decided not to forcibly transport Kadakkarappally, Kumar, and Chellappan to the airport for deportation to India, and instead escorted them from the Pascagoula labor camp.

265. Other Indian H-2B workers, including these Plaintiffs, working at Signal's Orange

facilities rapidly learned of the events at the Pascagoula labor camp on March 9, 2007. In response and out of fear for their continued well-being, some workers surreptitiously fled both camps.

266. Within a few days of Plaintiffs' and other Indian H-2B workers' arrival at its labor camps in late 2006 and early 2007, Signal personnel had conducted meetings at the labor camps between Plaintiffs and representatives from specific banks. In Orange, these meetings were with representatives from Capital One Bank.  In Pascagoula, these meetings were with representatives from M&M Bank.

267. At the instruction of Defendant Signal, Plaintiffs opened accounts with the designated bank and agreed to directly deposit their wages in these accounts. Defendant Signal's establishment of Plaintiffs' accounts with these banks gave it unique access to and control over Plaintiffs' funds.

268. At some point before April 10, 2007, on information and belief, after some Indian H-2B workers had fled Signal's Mississippi camp, the bank with which those workers had established similar accounts denied those departed workers access to their bank accounts and invalidated their ATM cards.

269. Upon information and belief, that Mississippi bank refused the departed workers access to their own bank accounts at Defendant Signal's behest.

270. Indian H-2B workers still working at Signal labor camps, including the Plaintiffs, heard about the difficulty departed Signal workers had in accessing their funds through Signal-established bank accounts and reasonably believed that similar action might be taken against them should they try to leave Defendant Signal's employ.

271. The information about workers' inability to access their money, combined with other factors described herein, contributed to the reasonable beliefs of Plaintiffs and the other remaining

Indian H-2B workers that if they tried to leave the employ of Defendant Signal they would face serious harm and/or threatened or actual abuse of the legal process.

272. Defendant Signal's actions on and after March 9, 2007 significantly intensified the reasonable fears of the remaining Plaintiffs and other Indian H-2B workers in the Pascagoula and Orange camps that if they tried to leave Signal's employ or oppose unlawful and coercive employment conditions at Signal, including by consulting with counsel, they faced the threat of physical restraint, detention, forced deportation, or other serious harms and/or abuses of the legal process.

273. Throughout the spring and summer of 2007, Signal personnel in the Mississippi and Texas camps held various meetings with the remaining Plaintiffs and other Indian H-2B workers to discuss the status of Plaintiffs' and other Indian H-2B workers' visas and green card applications.

274. Upon information and belief, during spring and summer 2007 Signal personnel conferred amongst themselves and with the Recruiter Defendants and the Legal Facilitator Defendants via phone and/or e-mail to reach agreement on what should be said to workers attending the meetings.

275. Soon after March 9, 2007, Defendant Signal held a camp-wide meeting in Pascagoula. Signal personnel told the Indian H-2B workers that Signal would sponsor their green cards if they stayed at Signal and obeyed Signal's rules, and warned that if workers held any meetings against Signal's interests, they would be terminated. As Signal understood would happen, workers at the Orange camp, including Plaintiffs, promptly learned what Signal personnel had said at this meeting, and understood it would apply to workers at Orange, as well.

276. In that same time period, Defendants Dewan and Burnett came to the Signal camp in Orange, Texas and again promised, in the presence of Signal personnel, that Signal, through its attorney Defendant Burnett, would make bona fide applications for green cards and obtain several

H-2B visa extensions for the workers who had not been terminated by Signal (plaintiffs in the *David* Litigation, including David, Sulekha, Thangamani, Kandhasamy, Khuttan, Andrews and Dhananjaya), and the other Indian H- 2B workers. Plaintiffs reasonably believed these promises.

277. In meetings and conversations in spring and summer 2007, Defendant Signal, through its agents and employees at the Pascagoula and Orange facilities, continued to promise that Signal would arrange for the H-2B visa extensions and green cards originally promised Plaintiffs when they were recruited in India and the United Arab Emirates.

278. At the same time as Defendant Signal was promising to arrange for H-2B visa extensions and green cards for the Plaintiffs as well as other Indian H-2B workers, Signal in fact was secretly evaluating all of the Indian workers with the intent not even to apply for visa extensions for certain of the Indian H-2B workers.

279. Plaintiffs' continuing dependence on Defendant Signal for their present and future immigration status, their continuing high levels of indebtedness, as well as other factors reasonably led Plaintiffs to fear serious harm and/or abuse of the legal process if they left Signal's employ.

280. Under such circumstances, these Plaintiffs reasonably felt like they had no choice but to continue working for Signal.

281. At various times relevant to Plaintiffs' claims, Defendant Signal refused to confirm whether valid H-2B visa extensions had in fact been obtained for Plaintiffs, coercing Plaintiffs to continue working for Signal in the hope that Signal would finally resolve their uncertain immigration status.

282. In addition, through the spring of 2007, Signal continued to recruit workers, including some of the Plaintiffs, to fill positions under the H-2B visas which Signal had been granted by the federal government.  As a result, the workers continued to pay recruitment fees with the

understanding they would have job opportunities at Signal.  The workers were told by Recruiter Defendants that Signal representatives would pick them up from the airport upon their arrival to their final destination in the United States and transported to Signal's facility. When the workers, including some of the Plaintiffs, arrived at their final destination in the United States, no one from Signal was there to pick them up, and consequently the work opportunity for which they had contracted was not provided to them.

283. Some of the workers who had not been picked up at the airport, including some of the Plaintiffs, contacted Signal's Orange, Texas facility to ask about their work opportunities and Signal failed to respond or told that there was no work opportunity for them at Signal.

284. Some of the workers who were not picked up at the airport, including some of the Plaintiffs, and who were stranded in a country foreign to them, overcame obstacles and received help from third-parties to travel to Signal's Orange, Texas facility.  After they arrived there, Signal management told them that they needed to spend the night in the camp while Signal management figured out what to do with the workers.  The next day, Signal management told them that they had to take a test testing the same skills for which they had already been tested.  After taking the test, Signal management told the workers that they had failed the test.  Signal used the test as a pretext for not employing the workers when Signal, at that point, had no intention of employing the workers who Signal had recruited to the United States.

285. Signal knew it had no intention of fulfilling its contractual promises and employing the workers before the workers left India and made payments to Signal's agents.  Nevertheless, Signal did not inform the workers, including the Plaintiffs, of its intention to breach the contract nor did Signal ensure that its agents inform the Plaintiffs that Signal would not fulfill its contractual obligations.  Once the workers, including the Plaintiffs, arrived to Signal's facilities in Texas and

Mississippi, Signal continued to defraud the workers and lie about its intention to not fulfill its obligation to employ the workers, including the Plaintiffs.

286. Since first contracting with Defendants in India and the United Arab Emirates, none of Plaintiffs have yet to receive from Defendants the green cards Defendants promised them. Despite clear contractual provisions requiring them to do so, the Recruiter Defendants, the Legal Facilitator Defendants, and the Labor Broker Defendants have refused to refund any of the moneys Plaintiffs paid to them for unsuccessful green card and visa processing

287. The fact that the Plaintiffs gave up opportunities for work and financial gain by leaving India, Singapore, Africa, Canada, and the Persian Gulf to come work in the United States at Signal was known or foreseeable to Defendants.

## FIRST CLAIM FOR RELIEF

THE TRAFFICKING VICTIMS PROTECTION REAUTHORIZATION ACT OF 2003

Forced Labor (18 U.S.C. § 1589); and Trafficking with respect to peonage, slavery, involuntary servitude, or forced labor) (18 U.S.C. §1590)

*Defendants Signal International LLC, Signal International, Inc., the Recruiter Defendants (Global Resources, Sachin Dewan, and Dewan Consultants); and the Legal Facilitator Defendants (Malvern C. Burnett, Law Offices of Malvern C. Burnett, Gulf Coast Immigration Law Center)*

288. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

289. Plaintiffs bring this claim against Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants.

290. Plaintiffs are authorized to bring these civil claims against Defendants pursuant to the civil remedies provision of the Trafficking Victims Protection Reauthorization Act of 2003

(TVPA), 18 U.S.C. § 1595.

291. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants attempted to and did subject Plaintiffs to forced labor in violation of 18 U.S.C. § 1589.[1]

292. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly attempted to and did physically restrain and/or threaten Plaintiffs with serious harm in order to obtain the labor and services of Plaintiffs in violation of 18 U.S.C. §1589(1).

293. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly attempted to and did obtain the labor and services of Plaintiffs using a scheme, plan, or pattern which, in the totality of the circumstances, was intended to coerce and did coerce Plaintiffs to believe that they would suffer serious harm if they were to leave the employ of Defendant Signal in violation of 18 U.S.C. § 1589(2).

294. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants' scheme to isolate Plaintiffs, to coerce them to live in conditions causing psychological harm, and to limit their outside contacts, including unlawful discrimination in violation of 42 U.S.C. § 1981, was designed to convince Plaintiffs that they would suffer serious harm if they were to leave the employ of Defendant Signal.

295. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants retaliated against Plaintiffs for attempts to exercise their legal rights, and threatened Plaintiffs with deportation and deceived Plaintiffs about the terms of their immigration status in a manner that constitutes an abuse of the legal process under 18 U.S.C. § 1589(3).

296. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly recruited, transported, harbored, provided, and/or obtained the Plaintiffs so as to obtain their labor

---

[1] The Abandoned Plaintiffs do not assert claims for forced labor in violation of 18 U.S.C. §1589.

and services in violation of laws prohibiting peonage, slavery, involuntary servitude, and forced labor within the meaning of the provisions of the Trafficking Victims Protection Act, 18 U.S.C. § 1590 (TVPA).

297. In violation of 18 U.S.C. § 1590, and in addition to the violations of 18 U.S.C. § 1589 set forth above, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly recruited, transported, harbored and/or obtained the Plaintiffs for labor or services in furtherance of these Defendants' violations of the following provisions of Title 18, Chapter 77 of the U.S. Code:

   a. enticing, persuading, or inducing the Plaintiffs to go on board an airliner and to go to various locations throughout the United Arab Emirates, India, and the United States, with the intent that they may be made or held in modern day slavery, violating 18 U.S.C. § 1583;

   b. knowingly and willfully holding Plaintiffs to involuntary servitude, as defined by the TVPA, 22 U.S.C. § 7102(5)(a) and (b), violating 18 U.S.C. § 1584;[2]

   c. removing, confiscating, or possessing Plaintiffs' passports and other immigration documents in the course of, or with the intent to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1592(a); and

   d. attempting to violate 18 U.S.C. §§ 1583, 1584, 1589, and 1590, violating 18 U.S.C. § 1594(a).

298. As a proximate result of the conduct of Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants, Plaintiffs have suffered injuries to their persons, businesses, and property, and other damages.

---

[2] The Abandoned Plaintiffs do not assert that Defendants knowingly and willfully held the Abandoned Plaintiffs to involuntary servitude in violation of 18 U.S.C. §1584.

299. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial, including attorneys' fees.

## SECOND CLAIM FOR RELIEF

RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT
18 U.S.C. § 1962(d)

*All Defendants*

300. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

301. Plaintiffs' RICO Case Statement, filed concurrently with Plaintiffs' original Complaint, is incorporated herein by reference.

302. Plaintiffs' claims under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 ("RICO"), are brought against all Defendants.

303. Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. § 1964(c).

304. Each of the Defendants is a "RICO person" within the meaning of 18 U.S.C. § 1963(1).

305. All Defendants and the United States Consular officers in India constitute an association-in-fact, and therefore an enterprise (the "RICO Enterprise I"), within the meaning of 18 U.S.C. § 1964(4).

306. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal are an association-in-fact, and therefore an enterprise (the "RICO Enterprise II"), within the meaning of 18 U.S.C. § 1964(4).

307. Recruiter Defendants, Defendant Signal, Legal Facilitator Defendants, Swetman Security, and Capital One Bank are an association-in-fact, and therefore an enterprise (the "RICO Enterprise III") within the meaning of 18 U.S.C. § 1964(4).

## The RICO Enterprises

<u>RICO Enterprise I</u>

308. RICO Enterprise I at all relevant times was an ongoing business relationship between all Defendants, and the United States Consular officers in India, with the common purpose of recruiting, transporting, providing, processing, and obtaining foreign workers to work on shipyards in the United States, including on Signal's operations in Texas and Mississippi.

309. RICO Enterprise I was engaged in interstate commerce in that its activities and transactions relating to the international and interstate movement of workers affect interstate commerce and frequently require travel and communications across state and international lines.

310. The members of RICO Enterprise I functioned as a continuing unit.

311. Defendants conducted or participated in, and/or conspired to conduct or participate in the affairs of RICO Enterprise I through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to recruit, obtain, transport, process, and provide workers through the use of fraudulent promises, exorbitant fees, forced labor, and/or trafficking.

312. Specifically, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

a.   Enticement into modern day slavery in violation of 18 U.S.C. § 1583.

b.   Involuntary servitude in violation of 18 U.S.C. § 1584. [3]

c.   Forced labor in violation of 18 U.S.C. § 1589;[4]

d.   Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590; and

[3] The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.
[4] The Abandoned Plaintiffs do not assert forced labor in violation of 18 U.S.C. § 1589.

    e.   Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a);

313. Specifically, all Defendants conducted or participated in and/or conspired to conduct the affairs of RICO Enterprise I by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.   Mail fraud to further their unlawful scheme in violation of 18 U.S.C. § 1341;

    b.   Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

    c.   Immigration document fraud in violation of 18 U.S.C. § 1546.

<u>RICO Enterprise II</u>

314. RICO Enterprise II was at all relevant times an ongoing business relationship between Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal with the common purpose of selling United States green cards, visas, and work opportunities to Indian workers to convince such workers to pay fees and to travel to the United States to work for companies, including Signal.

315. The members of RICO Enterprise II operated as a continuing unit.

316. RICO Enterprise II was engaged in interstate commerce in that its activities and transactions relating to the sale of United States green cards, visas, and job opportunities affect interstate commerce.

317. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted or participated in and/or conspired to conduct or participate in, the affairs of RICO Enterprise II through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to sell United States green cards and work opportunities to Indian workers for the purposes of furnishing such workers for employment at

Signal's operations.

318. Specifically, the Recruiter Defendants, the Legal Facilitator Defendants, and Defendant Signal conducted or participated in the affairs of RICO Enterprise II by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.   Enticement into modern day slavery in violation of 18 U.S.C. § 1583.

    b.   Involuntary servitude in violation of 18 U.S.C. § 1584.[5]

    c.   Forced labor in violation of 18 U.S.C. § 1589;[6]

    d.   Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590;

    e.   Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a);

    f.   Mail fraud in violation of 18 U.S.C. § 1341;

    g.   Wire fraud in violation of 18 U.S.C. § 1343; and

    h.   Immigration document fraud in violation of 18 U.S.C. § 1546.

<u>RICO Enterprise III</u>

319. RICO Enterprise III was at all relevant times an ongoing business relationship between the Recruiter Defendants, the Legal Facilitator Defendants, Defendant Signal, and Capital One Bank with the common purpose of providing and maintaining a consistent and acquiescent labor force at Signal operations.

320. RICO Enterprise III was engaged in interstate commerce in that its activities and transactions relating to maintaining and providing a consistent labor force at Signal occurred across state and international lines, and involve wages and working conditions at an employer engaged

---

[5] The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.
[6] The Abandoned Plaintiffs do not assert forced labor in violation of 18 U.S.C. § 1589.

in interstate commerce (Signal).

321. The members of RICO Enterprise III functioned as a continuing unit.

322. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted, or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III through a pattern of numerous acts of racketeering activity in violation of 18 U.S.C. § 1962(c) and 18 U.S.C. § 1962(d), related by their common goal to maintain a consistent and acquiescent H-2B Indian labor force at Signal through the use of fraudulent promises, forced labor, and trafficking.

323. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal conducted, or participated in, and/or conspired to conduct or participate in, the affairs of RICO Enterprise III by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1):

    a.  Enticement into modern day slavery in violation of 18 U.S.C. § 1583.

    b.  Involuntary servitude in violation of 18 U.S.C. § 1584.[7]

    c.  Forced labor in violation of 18 U.S.C. § 1589;[8]

    d.  Trafficking persons with respect to modern day slavery, involuntary servitude, and forced labor in violation of 18 U.S.C. § 1590;

    e.  Unlawful document-related practices in furtherance of trafficking in violation of 18 U.S.C. § 1592(a);

    f.  Mail fraud to further their unlawful scheme in violation of 18U.S.C. § 1341;\

    g.  Wire fraud to further their unlawful scheme in violation of 18 U.S.C. § 1343; and

    h.  Immigration document fraud in violation of 18 U.S.C. § 1546.

## **Predicate Acts**

### Enticement to Slavery: 18 U.S.C. § 1583

---

[7] The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.
[8] The Abandoned Plaintiffs do not assert forced labor in violation of 18 U.S.C. § 1589.

324. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of enticement into modern-day slavery in violation of 18 U.S.C. § 1583, and as set forth in Plaintiffs' First Claim for Relief.

<u>Involuntary Servitude: 18 U.S.C. § 1584[9]</u>

325. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of involuntary servitude in violation of 18 U.S.C. §1584, and as set forth in Plaintiffs' First Claim for Relief.

<u>Forced Labor: 18 U.S.C. § 1589[10]</u>

326. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal through RICO Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of forced labor in violation of 18 U.S.C. § 1589, and as set forth in Plaintiffs' First Claim for Relief.

<u>Trafficking for the Purposes of Forced Labor and/or<br>Involuntary Servitude: 18 U.S.C. § 1590</u>

327. As set forth in the preceding paragraphs, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal through RICO Enterprises I, III, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of trafficking for the purposes of forced labor and/or involuntary servitude in violation of 18 U.S.C. § 1590, and as set forth in Plaintiffs' First Claim for Relief.

<u>Document Servitude: 18 U.S.C. § 1592</u>

---

[9] The Abandoned Plaintiffs do not assert involuntary servitude in violation of 18 U.S.C. § 1584.
[10] The Abandoned Plaintiffs do not forced labor in violation of 18 U.S.C. § 1589.

328. Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through Enterprises I, II, and III willfully, knowingly, and intentionally committed and/or conspired to commit multiple predicate acts of document servitude in violation of 18 U.S.C. § 1592, and as set forth in Plaintiffs' First Claim for Relief.

<u>Mail and Wire Fraud: 18 U.S.C. §§ 1341 and 1343</u>

329. As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprise I, made and/or conspired to make false promises regarding green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of money.

330. As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, made and/or conspired to make false statements related to applications submitted to the U.S. Government for H-2B visas and false promises to Plaintiffs regarding green cards and other benefits in a scheme calculated to defraud Plaintiffs out of large sums of money.

331. As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprise I, used the mails and wire communications, including communications via telephone, fax, internet and/or e-mail, on numerous occasions to further these fraudulent schemes.

332. As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, used the mails and wire communications, including communications via telephone, fax, internet and/or e-mail on numerous occasions to further this fraudulent scheme.

333. These willful, knowing, and intentional acts constitute mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343.

<u>Immigration Document Fraud: 18 U.S.C. § 1546(a)</u>

334. As set forth in the preceding paragraphs and in Exhibit 1, Defendants, through RICO Enterprise I, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to Plaintiffs despite these Defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

335. As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, obtained, accepted, and/or received H-2B visas despite knowing these visas to have been procured through false statements and/or fraud on the U.S. Government.

336. As set forth in the preceding paragraphs and in Exhibit 1, Recruiter Defendants, Legal Facilitator Defendants, and Defendant Signal, through RICO Enterprises I, II, and III, fraudulently sold and/or conspired to sell H-2B visa extensions and green cards to Plaintiffs despite these Defendants' awareness that applications for these green cards and visa extensions were not bona fide or lawful under United States immigration law.

337. These willful, knowing, and intentional acts constitute immigration document fraud in violation of 18 U.S.C. § 1546(a).

**Pattern of Related Racketeering Acts**

338. Defendants engaged in the racketeering activity described in this Claim repeatedly starting in 2003 and continuing at least through January 2009 with respect to approximately 590 Indian workers.

339. Upon information and belief, Signal sought new Indian H-2B workers for employment at Signal who may be subject to similar racketeering activities, stopping this recruitment only upon the filing of the David Litigation.

340. Defendants, though the RICO Enterprises, rely on the racketeering acts described in this

Complaint to conduct their regular business activities.

341. Defendants' racketeering acts have or had similar purposes: to profit from the fraudulent recruitment and forced labor of Plaintiffs and other Indian workers, and to recruit, obtain, provide and maintain a consistent, submissive, and compliant Indian H-2B guestworker labor force at Signal's operations.

342. Defendants' acts yielded similar results and caused similar injuries to Plaintiffs, including payment of high fees, assumption of significant interest bearing debt, loss of real and personal property, lost work opportunities, lost or unpaid wages and additional legal fees.

343. As set forth in the preceding paragraphs and in Exhibit 1, the racketeering acts have or had similar participants: the Recruiter Defendants, the Legal Facilitator Defendants, the Labor Broker Defendants, and Signal.

344. As set forth in the preceding paragraphs and in the attached Exhibit 1, Defendants, though the RICO Enterprises, directed their racketeering activities at similar victims: Indian workers who contacted the Recruiter Defendants in search of green cards, economic opportunity, and stable employment in the United States.

345. Defendants' acts have or had similar methods of commission, such as common recruitment tactics, relatively consistent practices with respect to collecting payments from Plaintiffs and other Indian workers, and use of similar employment practices and policies with respect to Plaintiffs and other Indian workers.

## Injury

346. As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this section, Plaintiffs have suffered injuries to their property and/or business, including but not limited to: exorbitant fees paid by Plaintiffs for green cards, visas and other

immigration and recruitment-related services; interest on debts assumed by Plaintiffs to pay such fees; losses of personal and real property incurred in reliance on Defendants' fraudulent acts; lost and unpaid wages, excessive charges from room and board, and other pecuniary and/or losses to real or personal property.

347. Plaintiffs are entitled to an award of damages in an amount to be determined at trial, including treble damages and attorneys' fees and costs associated with this action.

### THIRD CLAIM FOR RELIEF

VIOLATIONS OF THE CIVIL RIGHTS ACT OF 1866
42 U.S.C. 1981

*Defendant Signal (Signal International LLC, Signal International Inc., Signal International Texas, G.P., and Signal International Texas, L.P.)*

348. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

349. Plaintiffs assert this claim pursuant to 42 U.S.C. § 1981 for declaratory relief, and damages against Defendant Signal.[11]

350. The actions of Defendant Signal, as set forth herein, violated Plaintiffs' rights to receive full and equal benefit of all laws as guaranteed by 42 U.S.C. § 1981, including Plaintiffs' rights to enjoy and benefit from non-discriminatory employment relationships with Defendant Signal.

351. Specifically, Defendant Signal subjected Plaintiffs to discriminatory and offensive mandatory room and board arrangements at the Signal labor camp in Orange.

352. Defendant Signal did not subject its non-Indian and/or U.S. citizen employees to the same or similar room and board arrangements.

353. As set forth in the preceding paragraphs, Defendant Signal also imposed discriminatory

---

[11] The Abandoned Plaintiffs do not assert claims under the Civil Rights Act of 1866, 42 U.S.C. § 1981.

job-related requirements and adverse terms and conditions of employment to which non-Indian and/or U.S. citizen employees were not similarly subject.

354. As set forth in the preceding paragraphs, through the actions and statements of its personnel referring to and/or directed at Plaintiffs and other Indian H-2B workers, Defendant Signal maintained an objectively hostile and abusive work environment on account of Plaintiffs' race, national origin, and/or alienage.

355. As set forth in the preceding paragraphs, Defendant Signal's discriminatory and offensive treatment of Plaintiffs was sufficiently severe that it created a hostile work environment in violation of 42 U.S.C. § 1981.

356. Plaintiffs reasonably perceived their work environment to be hostile, abusive, and discriminatory on the basis of their race, national origin, and/or alienage.

357. Defendant Signal's hostile, abusive, and discriminatory treatment of Plaintiffs and others similarly situated was unwelcome.

358. Defendant Signal knowingly, willfully, maliciously, intentionally, and without justification acted to deprive Plaintiffs of their rights.

359. As a result of Defendant Signal's unlawful acts, Plaintiffs have suffered injury to their property and/or persons.

360. Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF

VIOLATIONS OF THE KU KLUX KLAN ACT OF 1871
42 U.S.C. § 1985 and the Thirteenth Amendment

*Defendant Signal (Signal International LLC, Signal International, Inc., Signal International*

*Texas, G.P., and Signal International Texas, L.P.), the Recruiter Defendants (Global Resources, Inc., Sachin Dewan and Dewan Consultants), and the Legal Facilitator Defendants (Malvern C. Burnett, Law Offices of Malvern C. Burnett, Gulf Coast Immigration Law Center)*

361. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

362. Plaintiffs assert this claim pursuant to 42 U.S.C. § 1985(3) for declaratory relief, and damages against Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants.

363. As set forth in the preceding paragraphs and Plaintiffs' First Claim for Relief, Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants, along with non-defendants, acting at the discretion of those defendants (including a private security firm and Capital One Bank) conspired, agreed, planned and coordinated for the purpose of depriving Plaintiffs of equal protection of their rights under the Thirteenth Amendment to the United States Constitution and its implementing and enforcing statutes (inter alia, 18 U.S.C. §§ 1589, 1590) to be free from forced labor, involuntary servitude, and trafficking in persons.

364. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants were motivated by racial, anti-Indian, and/or anti-immigrant animus when they conspired to deprive Plaintiffs of their rights and/or acted in furtherance of a conspiracy to deprive Plaintiffs of their rights.

365. Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants knowingly, willfully, maliciously, intentionally, and without justification planned and acted to deprive Plaintiffs of their rights.

366. As a result of the unlawful acts of Defendant Signal, Recruiter Defendants, and Legal Facilitator Defendants, Plaintiffs have suffered damages.

367. Plaintiffs seek all appropriate relief, including declaratory relief, attorneys' fees, costs of

this action, and damages, including compensatory and punitive damages, in an amount to be determined at trial.

## **FIFTH CLAIM FOR RELIEF**

FRAUD AND NEGLIGENT MISREPRESENTATION UNDER TEXAS LAW

*All Defendants*

368. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

369. As set forth in the preceding paragraphs and in the attached Exhibit 1, Defendants, individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and untrue statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

370. As set forth in the preceding paragraphs and in the attached Exhibit 1, Defendants knowingly or negligently failed to disclose material facts to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

371. Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant fees requested by the Labor Broker Defendants, Recruiter Defendants, and/or Legal Facilitator Defendants.

372. Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay exorbitant fees to the Labor Broker Defendants, Recruiter Defendants, and/or Legal Facilitator Defendants, and to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for

the Labor Broker Defendants and/or Defendant Signal.

373. Plaintiffs were entitled to rely on Defendants' representations.

374. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Labor Broker Defendants, Recruiter Defendants, and/or Legal Facilitator Defendants.

375. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by Defendants and their agents, employees and/or representatives.

376. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs sold personal and real property and surrendered employment opportunities in India, the Middle East, Singapore, Africa, and Canada.

377. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs left their homes and jobs and India and other countries and traveled to the United States to work for Defendant Signal.

378. As a direct and proximate result of Defendants' knowing, willing, intentional, and/or negligent actions, Plaintiffs have been injured.

379. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## <u>SIXTH CLAIM FOR RELIEF</u>

BREACH OF CONTRACT UNDER TEXAS LAW

*All Defendants*

380. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

381. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, offered to obtain permanent residence and immigration status for Plaintiffs in the United States within 18 to 24 months as well as steady work opportunities in the United States with Defendant Signal and/or Labor Broker Defendants in exchange for Plaintiffs' payment of exorbitant fees to Defendants and their employees, agents and/or representatives and agreement to work for Defendant Signal and/or Labor Broker Defendants.

382. Plaintiffs accepted Defendants' offers, paid the agreed upon fees, travelled to the United States, and performed the agreed-upon work.

383. Defendants breached their contracts with Plaintiffs by failing to comply with their binding promises regarding employment, permanent residence and immigration status.

384. In reliance on these agreements, Plaintiffs paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

385. As a direct result of Defendants' breach, Plaintiffs have suffered damages.

386. Plaintiffs are entitled to recover actual compensatory damages in an amount to be proven at trial.

## SEVENTH CLAIM FOR RELIEF

FRAUD AND NEGLIGENT MISREPRESENTATION UNDER MISSISSIPPI LAW

*All Defendants*

387. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs.

388. As set forth in the preceding paragraphs and in the attached Exhibit 1, Defendants,

individually and through their agents, employees, and/or representatives, knowingly and/or negligently made materially false and untrue statements and representations to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

389. As set forth in the preceding paragraphs and in the attached Exhibit 1, Defendants knowingly or negligently failed to disclose material facts to Plaintiffs regarding the nature and terms and conditions of applications and opportunities for immigration status and employment in the United States.

390. Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay the exorbitant fees requested by the Labor Broker Defendants, Recruiter Defendants, and/or Legal Facilitator Defendants.

391. Defendants intended that the false statements made by Defendants and/or their agents, employees, and/or representatives would induce Plaintiffs to pay exorbitant fees to the Labor Broker Defendants, Recruiter Defendants, and/or Legal Facilitator Defendants, and to leave their homes and jobs in India and the United Arab Emirates and travel to the United States to work for the Labor Broker Defendants and/or Defendant Signal.

392. Plaintiffs were entitled to rely on Defendants' representations.

393. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs paid large sums of money to Labor Broker Defendants, Recruiter Defendants, and/or Legal Facilitator Defendants.

394. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs incurred substantial interest-bearing debts in order to pay recruitment, immigration-related, and travel fees charged by

Defendants and their agents, employees and/or representatives.

395. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs sold personal and real property and surrendered employment opportunities in India, the Middle East, Singapore, Canada and Africa.

396. In reliance or reasonable reliance on Defendants' false and/or negligent representations regarding green cards and employment opportunities, Plaintiffs left their homes and jobs and India and other countries and traveled to the United States to work for Defendant Signal.

397. As a direct and proximate result of Defendants' knowing, willing, intentional, and/or negligent actions, Plaintiffs have been injured.

398. Plaintiffs are entitled to recover compensatory and punitive damages in an amount to be proven at trial.

## EIGHTH CLAIM FOR RELIEF

BREACH OF CONTRACT UNDER MISSISSIPPI LAW

*All Defendants*

399. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

400. As set forth in the preceding paragraphs, Defendants, individually and through their agents, employees and/or representatives, offered to obtain permanent residence and immigration status for Plaintiffs in the United States within 18 to 24 months as well as steady work opportunities in the United States with Defendant Signal and/or Labor Broker Defendants in exchange for Plaintiffs' payment of exorbitant fees to Defendants and their employees, agents and/or representatives and agreement to work for Defendant Signal and/or Labor Broker Defendants.

401. Plaintiffs accepted Defendants' offers, paid the agreed upon fees, travelled to the United States, and performed the agreed-upon work.

402. Defendants breached their contracts with Plaintiffs by failing to comply with their binding promises regarding employment, permanent residence and immigration status.

403. In reliance on these agreements, Plaintiffs paid large sums of money and entered into substantial debts, surrendered other employment opportunities, and incurred other financial losses.

404. As a direct result of Defendants' breach, Plaintiffs have suffered damages.

405. Defendants' actions evince actual malice and/or reckless indifference towards the Plaintiffs.

406. As a direct result of Defendants' breach, Plaintiffs have suffered direct and consequential damages, and are entitled to recover actual compensatory damages, including opportunity costs, and punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

a. Declaratory relief;

b. Compensatory damages;

c. Punitive damages;

d. Treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

e. An award of prevailing party costs, including attorney fees;

f. A finding of alter ego between Signal International Texas, G.P. and Signal International Texas, L.P., thus piercing the corporate veil;

g. A finding of alter ego between Signal International Texas, L.P. and Signal International

*Third Amended Complaint*                                                                                      70

LLC, thus piercing the corporate veil;

h.  A finding that Signal International, Inc. is the successor in interest to Signal International LLC, or in the alternative, a finding of alter ego between Signal International LLC and Signal International, Inc., thus piercing the corporate veil;

i.  A finding of alter ego among Malvern C. Burnett, Gulf Coast Immigration Law Center, L.L.C., and Law Offices of Malvern C. Burnett, A.P.C., thus piercing the corporate veil;

j.  A finding of alter ego between Sachin Dewan and Dewan Consultants Pvt., thus piercing the corporate veil;

k.  A finding of alter ego between Billy R. Wilks and J & M, thus piercing J & M's corporate veil;

l.  A finding that J & M Marine is the successor of J & M; and

m.  Such other relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury in this action of all issues so triable.

Date: May 4, 2015.                    Respectfully Submitted,

By:  /s/ Christopher J. Willett
Christopher J. Willett
Texas Bar No. 24061895
Kayvon Sabourian
Texas Bar No. 24076824 (admitted by *pro hac vice*)
EQUAL JUSTICE CENTER and
TRANSNATIONAL WORKER RIGHTS CLINIC
510 S. Congress Ave., Suite 206
Austin, TX 78704
Telephone: (512) 474-0007
Facsimile: (512) 474-0008

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2015, I electronically filed the foregoing Plaintiffs'

Unopposed Motion for Leave to Amend Complaint with the Clerk of the Court using the CM/ECF

system, which will automatically send e-mail notification of such filing to all ECF participants.

         /s/ Kayvon Sabourian
         Kayvon Sabourian
         Texas State Bar No. 24076824
         Attorney for Plaintiffs